Gerald W. SHIELDS,
Plaintiff–Appellant,

v.

David BURGE, Individually, and as Superintendent with the Illinois State Police, et al., Defendants–Appellees.

No. 88–1485.

United States Court of Appeals,
Seventh Circuit.

Submitted Sept. 20, 1988.*

Decided May 15, 1989.

---

* This case was originally set for oral argument. Shields moved to waive oral argument. We granted that motion, and the case was submitted on the briefs and record.

Jeff Justice, Hull Campbell & Robinson, Decatur, Ill., for plaintiff-appellant.

Neil F. Hartigan, Atty. Gen., William D. Frazier, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

This case presents issues of potential 42 U.S.C. § 1983 liability stemming from Illinois State Police officials' investigation of alleged misconduct by a State Police officer. Plaintiff Gerald Shields was a State Police sergeant and a narcotics investigator in the department's Division of Criminal Investigation. In January, 1985, Shields was removed from his assignment as a narcotics investigator based on reports that he had unlawfully transferred marijuana to a confidential source. At that time, the State Police's Division of Internal Investigations began an investigation (the "internal investigation") to determine if Shields had violated any departmental rules and regulations. In March, 1985, Shields' supervisor told the superintendent of Internal Investigations, David Burge, that a confidential source had stated that Shields had provided information about an ongoing narcotics investigation to one of that investigation's targets. The Division of Internal Investigations continued to investigate both allegations against Shields.

In June, 1985, as part of the internal investigation, Sergeants Gerald Courtney and Gerald Leisch of the Division of Internal Investigations searched the desk in Shields' office. Courtney and Leisch also searched Shields' state-issued automobile. During the automobile search, Courtney and Leisch happened upon Shields' locked briefcase, which they also opened and searched. Courtney and Leisch had neither a warrant nor Shields' consent to search the desk, automobile, or briefcase.

In the meantime, in May, 1985, the Macon County Circuit Court had appointed a special prosecutor to investigate whether Shields had committed any crimes. That investigation eventually resulted in an indictment against Shields but no convictions. Although the special prosecutor's investigation paralleled the internal investigation, the June, 1985 searches by Courtney and Leisch were not connected with the criminal investigation.

During the time the investigations were ongoing, Shields was suffering a great deal of stress. In June and July of 1985, Shields was seeing a State Police psychologist for counseling. The psychologist recommended that Shields take a medical disability leave. Shields' superiors granted him the leave. However, Shields alleged that Gerald Hopper, the Division of Internal Investigations' second in command, pressured the psychologist into reversing his opinion that Shields needed a medical leave. According to Shields, Burge had ordered Hopper to pressure the psychologist.

Shields sued Burge, Hopper, Courtney, and Leisch for damages under 42 U.S.C. § 1983 for violating his civil rights during the internal investigation. Specifically, Count I of Shields' complaint alleged that the desk, automobile, and briefcase searches violated the Fourth Amendment. Count II alleged that the effort to persuade the psychologist to change his diagnosis violated Shields' constitutional right to privacy. The district court granted the defendants summary judgment on Count I and

dismissed Count II for failure to state a claim.[1] Shields appeals.

## I.

Shields asserts that the district court erred in granting the defendants summary judgment on the desk search. The district court, applying the plurality's test in *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), held that searching Shields' desk did not violate the Fourth Amendment. In *Ortega*, the plurality refused to apply a warrant or probable cause standard when a government employer searches an employee's office, desk, or file cabinet to retrieve government property or to investigate work-related misconduct. *Id.* at 719–26, 107 S.Ct. at 1499–1503. Instead, such a work-related "workplace" search is lawful if the search is "reasonable[ ] under all the circumstances." *Id.* at 725–26, 107 S.Ct. at 1502. The plurality explained that a search is reasonable if it is "justified at its inception" and if it is "reasonably related in scope to the circumstances" that justified it. *Id.* at 726, 107 S.Ct. at 1503 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 742–43, 83 L.Ed.2d 720 (1985)). A workplace search to investigate work-related misconduct ordinarily is "justified at its inception" if reasonable grounds exist to suspect that the search will turn up evidence of the employee's misconduct. *Id.* 480 U.S. at 726, 107 S.Ct. at 1502–03. An investigatory workplace search is reasonable in scope "when the measures taken are reasonably related" to the search's objective and are not excessively intrusive in light of the misconduct's nature.

The district court found that searching Shields' desk was reasonable under *Ortega*. The court found that the search was reasonable at its inception because the defendants had an individualized suspicion of work-related misconduct by Shields and be-

cause the defendants had investigated Shields five or six months before searching his desk. The court found that the search was reasonable in scope because it was reasonable for the defendants to expect Shields' desk to contain information regarding Shields' misconduct.

Before analyzing the merits, we must determine what the *Court* (not just the plurality) held in *Ortega*. Whenever the Court decides a case without producing a majority rationale, it is necessary to decide whether the lead opinion or one of the other Justices' opinions supplies the Court's holding that binds lower courts. Cf. *Virgin Islands v. Rasool*, 657 F.2d 582, 592–93 (3d Cir.1981). The four dissenters in *Ortega* insisted on a probable cause and warrant requirement for workplace searches. 480 U.S. at 732–48, 107 S.Ct. at 1514 (dissenting opinion). Justice Scalia, who supplied the fifth vote necessary for the Court's decision to reverse and remand, arguably adopted a less stringent standard than the plurality: "I would hold that government searches to retrieve work-related materials or to investigate violations of workplace rules—searches of the sort that are regarded as reasonable and normal in the private-employer context—do not violate the Fourth Amendment." *Id.* at 732, 107 S.Ct. at 1506 (Scalia, J., concurring in the judgment).

We conclude that the *Ortega* plurality's reasonableness analysis governs work-related workplace searches. This court has recently stated that in *Ortega*, "the Court concluded that government employers were subject to a reasonableness standard when they conducted workplace searches." *Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1314 (7th Cir.1988). We did not distinguish between the plurality and concurring opinions. Moreover, the Ninth Circuit has found that Justice Scalia

---

**1.** Shields also brought a third count, alleging that the defendants carried on a campaign of harassment designed to drive him out of his job and deprive him of his right to employment without due process. The district court granted the defendants' motion for summary judgment on Count III and Shields has not challenged that decision on appeal.

Shields also sued the defendants for damages in their official capacities. The official capacity suit is really a suit against the state and is barred by the Eleventh Amendment. See *Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 3104–06, 87 L.Ed.2d 114 (1985).

did not articulate a different standard than the plurality but joined in the plurality's "reasonableness under all the circumstances" test. *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1335 (9th Cir.1987). This is consistent with our statement in *Schaill*. Even if we believed that Justice Scalia did adopt a less stringent standard than the plurality, we would still follow the plurality's reasonableness test because it is the Court's least-common-denominator holding. See *Britton v. South Bend Community School Corp.*, 819 F.2d 766, 768–69 (7th Cir.1987). Assuming Justice Scalia has adopted a less stringent standard, if a work-related workplace search was reasonable under the plurality's test, five Justices (the plurality and Justice Scalia) would uphold it. If a workplace search was not reasonable under the plurality's test, eight Justices (the plurality and the dissenters) would hold it unlawful. Therefore, applying the plurality's reasonableness test is the proper course to follow. Cf. *Britton*, 819 F.2d at 770–72 (discussing the application of the Court's opinions in *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)).

Applying the reasonableness test here may present a problem, though, for as Shields points out the factual record concerning the desk search is extremely thin. The only evidence concerning the search (and the entire investigation for that matter) is Burge's affidavit. That affidavit essentially stated that Burge had received reports of Shields' misconduct, and that the Division of Internal Investigations had been investigating Shields since January, 1985. The record contains nothing concerning the tip's nature, the informant's reliability, the extent to which the tip was corroborated, or any other facts that might have led the defendants to suspect that Shields was involved in any misconduct. See *Copeland v. Philadelphia Police Dept.*, 840 F.2d 1139, 1144 (3d Cir.1988). The affidavit also contains nothing to indicate why the defendants expected to find any evidence in Shields' desk.

It may be that such evidentiary detail is not necessary. The essential principle that *Ortega* teaches is that an employer's workplace search must be reasonable. Reasonableness depends upon the circumstances presented in a given situation and upon balancing the public, governmental, and private interests at stake in that situation. See *Ortega*, 480 U.S. at 722–23, 107 S.Ct. at 1500–01; cf. *Schaill, supra*, at 1318–22 (balancing the competing interests involved and upholding a high school athletic program drug testing plan). *Llaguno v. Mingey*, 763 F.2d 1560, 1564–65 (7th Cir.1985).

■ Several factors in this case favor concluding that searching Shields' desk was reasonable. The public and government have strong interests in ferreting out misconduct by police officers. "A trustworthy police force is a precondition of minimum social stability in our imperfect society...." *Biehunik v. Felicetta*, 441 F.2d 228, 230 (2d Cir.1971). Moreover, illicit drug use, and the commerce in illicit drugs, are scourges on our society; corruption among drug enforcement officers can seriously frustrate efforts to halt those scourges. Cf. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 178 (5th Cir.1987), *aff'd*, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). It is undisputed that the defendants had information that Shields had engaged in serious misconduct—supplying marijuana to a source and tipping a target about an ongoing investigation. While the details about this information are sketchy (at best), Shields does not dispute that the information was sufficient for the defendants to remove him from his assignment as a narcotics investigator and to investigate him. And, as the defendants note, it was not unreasonable for them to think that searching Shields' desk would turn up the kind of evidence that would link Shields to the alleged misconduct. For example, one might reasonably suppose the desk could contain evidence of Shields' communications with the target he tipped off, such as phone messages, calendar entries, memoranda, or information concerning the investigation of the target.

We are still troubled by the thin record, however, especially given the fact that the

search did not occur until five or six months into the investigation. The district court found that this fact supported the search's reasonableness, but that is not necessarily so. The long investigation could cut the other way; if a thorough five- or six-month investigation failed to corroborate the initial information the defendants had about Shields' alleged misconduct, an inference would arise that instead of being based on reasonable grounds that the search would discover relevant evidence, the search was merely a fishing expedition conducted with the *hope* that something would turn up. Although it eventually turned out that Shields admitted misconduct, Burge's affidavit does not state whether the defendants discovered the evidence of misconduct (other than the initial tips) before, during, or after the search.

It is a close question whether the thin record before us supports the desk search's reasonableness. The Third Circuit, in *Copeland,* upheld under *Ortega* the reasonableness of a urinalysis of a police officer based upon what seems to have been highly suspect evidence. The only information the defendants in *Copeland* had was an uncorroborated allegation by the officer's former girlfriend (who was also a police officer) that she had seen the officer use drugs in her presence. The allegation came after a "heated altercation" between the officer and the former girlfriend. The former girlfriend eventually retracted her accusation and a two-month investigation failed to reveal any other evidence implicating the officer in drug use. See 840 F.2d at 1142, 1144. The *Copeland* court held that despite all the factors indicating that the former girlfriend's accusation was false, it was sufficient to supply a reasonable suspicion that the officer used drugs, and to support the urinalysis. *Id.* at 1144.

While it appears that this case and *Copeland* are similar and that *Copeland* would support upholding the desk search here, there are at least two differences between this case and *Copeland.* In *Copeland,* the informant was identified as a police officer; here, we have no idea who the informants were. Moreover, in *Copeland,* the informant supplied firsthand (though possibly false) information about the officer's drug use; here, again, we have no idea how the informants received their information about Shields.

We need not decide whether the differences between this case and *Copeland* require a different result here because we do not have to decide whether the record here is sufficient to support the desk search. The only relief Shields requested from the defendants was damages. Therefore, we may affirm the district court on a firmer ground: qualified immunity.

■ Qualified immunity insulates government officials from civil damages liability when the officials' actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a right to be "clearly established," the right's contours must be sufficiently clear so that the officials could have reasonably believed that their actions were lawful. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). This does not mean that an authoritative case holding the officials' exact conduct unlawful must exist before the officials can be liable; it does mean, however, "that in light of pre-existing law the unlawfulness must be apparent." *Id.*

Whether or not the desk search actually violated the Fourth Amendment, it was not clearly established at the time of the search that the search was unlawful. Although the Supreme Court had held that an employee has a reasonable expectation of privacy against police intrusions in the workplace, *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), it was not clear whether that expectation carried over to work-related intrusions by superiors. Indeed, in *Mancusi,* the Court suggested that an employee might not have any reasonable expectation of privacy against his superiors. See *id.* at 369, 88 S.Ct. at 2124; see also *Ortega,* 480 U.S. at 717, 107 S.Ct. at 1498.

Even if Shields had a clearly established privacy expectation against his superiors in his desk at the time the defendants searched the desk, it was not clear that searching the desk as part of an investigation into work-related misconduct (even without a reasonable suspicion that the desk contained evidence) would violate the Fourth Amendment. It is true that several courts, including this one, had held that an employer's searching or "bugging" an employee's office, without a warrant or probable cause, violated the Fourth Amendment. See *Gillard v. Schmidt*, 579 F.2d 825 (3d Cir.1978) (warrantless search of school guidance counselor's office to find an unflattering cartoon); *United States v. Speights*, 557 F.2d 362 (3d Cir.1977) (warrantless search of policeman's locker for sawed-off shotgun); *United States v. Hagarty*, 388 F.2d 713 (7th Cir.1968) (warrantless eavesdropping of IRS agent's office conversations). Cf. *United States v. McIntyre*, 582 F.2d 1221 (9th Cir.1978) (interception of police officer's telephone conversations without court approval violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(1)(a) & (b)). But those cases either involved criminal investigations or were otherwise distinguishable from cases involving only work-related searches. See *Gillard*, 579 F.2d at 829 n. 1 (distinguishing cases involving work-related searches); *Speights*, 557 F.2d at 362 (search made at prosecutor's request); *Hagarty*, 388 F.2d at 717 (court noted that eavesdropping was designed to detect criminal activity and on that basis distinguished cases upholding employer workplace searches); *McIntyre*, 582 F.2d at 1224 (wiretap could not be justified as an "internal affairs investigation" because it involved investigation of a crime outside the workplace).

Shields does not contend on appeal that the desk search was part of any criminal investigation; instead it was aimed solely at discovering evidence that he had violated State Police rules and regulations (that is, work-related misconduct). As the Supreme Court noted in *Ortega*, "surprisingly little case law" existed regarding the propriety of such searches. What case law did exist

was a somewhat mixed bag, some of which suggested that work-related searches are reasonable simply because of the government's power as an employer to supervise and investigate its employees' job performance. See *Ortega*, 480 U.S. at 720–21, 107 S.Ct. at 1499–1500 and the cases it cites. The Court in *Ortega* read this court's opinion in *United States v. Nasser*, 476 F.2d 1111, 1123 (7th Cir.1973) as holding that " 'work-related' " searches and seizures are reasonable under the Fourth Amendment." See *Ortega*, 480 U.S. at 720–21, 107 S.Ct. at 1500. In *Williams v. Collins*, 728 F.2d 721 (5th Cir.1984) the Fifth Circuit held in a common law invasion of privacy case involving government officials that "[i]t is by no means certain that Williams had a reasonable expectation of privacy in his government-furnished desk, in relation to the possibility of his supervisors entering the desk as part of an investigation of Williams' job performance...." *Id.* at 728.

It would have been reasonable in 1985 for the defendants to read the relevant case law similarly to the way the federal courts, including the Supreme Court, have read it, and conclude that searching Shields' desk would not violate the Fourth Amendment. This is especially so given that this was an internal investigation of serious misconduct by a police officer. The Second Circuit, in *Biehunik v. Felicetta*, *supra*, emphasized the special public interest in police integrity in holding that police officers might be subject to certain noncriminal searches and seizures that might otherwise violate the Fourth Amendment. See 441 F.2d at 230; cf. *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 490–91 (9th Cir.1986), which held, based largely on *Biehunik*'s discussion of the government's interest in police integrity, that it was not clearly established in 1981 that a work-related investigatory strip search of a police officer, without reasonable suspicion to believe the search would turn up evidence of misconduct, would violate the Fourth Amendment. Since it was not clearly established that searching Shields' desk would be unlawful, the defendants are immune from damages for that search.

## II.

Shields also argues that the district court erred in granting summary judgment on his claim that the defendants' search of his briefcase that they found in his state-issued automobile violated the Fourth Amendment. The district court held that the defendants were immune from damages for that search. We agree.

Shields does not contest the district court's decision that the defendants did not violate the Fourth Amendment by searching the state-issued automobile. Even if Shields had contested the automobile search, and persuaded us that the district court was wrong, we would still hold that the defendants could have reasonably believed that the automobile search was legal. Shields' state-issued automobile was (or the defendants could have reasonably believed it was—Shields cites no cases clearly establishing otherwise) as much a part of Shields' workplace as his desk. Cf. *Ortega*, 480 U.S. at 715–16, 107 S.Ct. at 1497–98 (defining "workplace"). The same factors that could have led the defendants to reasonably believe that searching Shields' desk was legal apply equally to the automobile search. Therefore, for purposes of discussing the briefcase search, we may assume that the automobile search was a lawful, noncriminal workplace search.

The briefcase search is distinct, however, from the automobile search. The Supreme Court in *Ortega* noted that "[t]he appropriate standard for a workplace search does not necessarily apply to a closed personal ... briefcase that happens to be within the [workplace]." 480 U.S. at 716, 107 S.Ct. at 1497. We need not decide, however, what that standard might be; we need only decide whether the briefcase search here violated clearly established law at the time of the search.

Shields argues that Supreme Court precedent clearly established that searching the briefcase violated the Fourth Amendment absent probable cause to believe that the briefcase contained evidence of misconduct. Shields asserts that since the defendants presented no facts from which the district court could conclude that probable cause existed or that the defendants could have reasonably believed probable cause existed, see *Anderson*, 107 S.Ct. at 3039–40, it was improper to grant summary judgment for the defendants on the briefcase search.

Shields relies on a line of Supreme Court cases beginning with *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and culminating with *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) and *United States v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). *Carroll* established what is commonly known as "the automobile exception" to the general Fourth Amendment warrant requirement. Under that exception, a police officer may search without a warrant an automobile he has legally stopped, if the officer has probable cause to believe that the automobile contains contraband or evidence of a crime. See *Carroll*, 267 U.S. at 149, 153–54, 45 S.Ct. at 283–84, 285–86; *Chambers v. Maroney*, 399 U.S. 42, 47–52, 90 S.Ct. 1975, 1979–82, 26 L.Ed.2d 419 (1970). *Ross* extended the exception, holding that during a valid automobile exception search a police officer may search without a warrant any containers they find in the automobile that might contain the object the officer is searching for. See *Ross*, 456 U.S. at 817–24, 102 S.Ct. at 2168–73; see also *Johns*, 469 U.S. at 479–80, 483–88, 105 S.Ct. at 882–83, 884–88.

Shields' reliance on the automobile exception cases ignores some critical distinctions between those cases and this case. Unlike the automobile exception cases, this case did not involve a search for criminal evidence; it was part of a noncriminal investigation into work-related misconduct. Moreover, as we have noted, Shields' state-issued automobile was as much a part of his workplace as his desk. The precise qualified immunity question we must answer is whether it was clearly established that searching a closed, personal briefcase during a lawful noncriminal search of Shields' workplace (his state-issued automobile) for evidence of work-related mis-

conduct violated the Fourth Amendment. Cf. *Anderson*, 107 S.Ct. at 3038–40. Despite the superficial similarity between *Ross* and *Johns* and this case, the distinctions are significant enough so that *Ross* and *Johns* do not answer that question.

Shields has not cited, nor have we found, any cases holding that it was unlawful to search a closed personal container found during a lawful workplace search. While a case directly on point is not necessary to clearly establish a constitutional right, " 'closely analogous cases ... decided before the defendants acted ... are required....' " *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.) (en banc) (citation omitted), *cert. denied* — U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

As noted, this case involves the search of a private briefcase found during a lawful workplace search. It is, essentially, a hybrid case—a search involving a more personal intrusion than a mere workplace search but supposedly justified by the same concerns that justify workplace searches. Very few analogous cases exist; the most closely analogous cases we have found involve searches or seizures of the person (as opposed to a private container) to investigate work-related misconduct. In *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187 (2d Cir.1984), the court held that strip searches of prison employees to investigate work-related misconduct must be supported by a reasonable suspicion that the search will turn up evidence. *Id.* at 203–04. The court also held that work-related visual body cavity searches of prison employees (that is, visually inspecting an employee's body cavities, see *id.* at 192 n. 3 for a detailed description) must be supported by a warrant and probable cause. *Id.* at 208. In reaching its conclusion concerning body cavity searches, the court emphasized how highly intrusive such searches are. *Id.* at 207; see also *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272–73 (7th Cir. 1983) (holding that visual body cavity searches of female misdemeanor arrestees were unlawful absent a reasonable suspicion that the arrestee was concealing weapons or contraband; court characterized visual body cavity searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission....").

On the other hand, in 1971 the Second Circuit, in *Biehunik v. Felicetta, supra,* upheld the "seizure" of sixty-two police officers for a lineup to determine if any had been involved in alleged police brutality. The *Biehunik* court weighed the public and governmental interests in maintaining a trustworthy police force against the intrusion on the individual officers and concluded that the lineup was reasonable despite the absence of probable cause to believe that any particular officer had been involved in the brutality. See 441 F.2d at 230–31. The court noted that the government and public had a unique interest in ensuring police integrity, so that "[t]he policeman's employment relationship by its nature implies that in certain aspects of his affairs, he does not have the full privacy and liberty from police officials that he would otherwise enjoy." *Id.* at 231.

A little more than a year after the briefcase search here, the Ninth Circuit, in *Kirkpatrick v. City of Los Angeles, supra,* decided that strip-searching a police officer to investigate alleged work-related misconduct violates the Fourth Amendment absent reasonable suspicion that the search will turn up evidence of that misconduct. 803 F.2d at 489. The court also decided, based in great part on *Biehunik* 's analysis, that the officer's right not to be strip-searched to investigate misconduct absent reasonable suspicion was not clearly established as of 1981. *Id.* at 490–91. Most important for our purposes is that the *Kirkpatrick* court did not impose a probable cause or warrant requirement for work-related strip searches, and that, even in 1986, the court considered the strip search's lawfulness an open question. See *id.* at 487–90, 491.

■ Comparing the briefcase search here to the searches and seizures in *Carey, Biehunik,* and *Kirkpatrick* convinces us that it was not clearly established that the

briefcase search violated the Fourth Amendment. The defendants could reasonably conclude that probable cause and a warrant were not required; only the visual body cavity searches in *Carey* required a warrant based upon probable cause, and the *Carey* court emphasized the severe intrusion on personal dignity such searches represent. The level of intrusion is relevant to a search's reasonableness, see *Mary Beth G.*, 723 F.2d at 1272, and it was certainly reasonable to conclude that searching the briefcase was not as intrusive as searching a person's body cavities. *Kirkpatrick* and *Carey* did insist upon reasonable suspicion for strip searches. Again, however, it is at least arguable that a strip search is more intrusive than searching a briefcase. Moreover, while the record here may not be sufficient to support a reasonable suspicion that searching the briefcase would turn up evidence of Shields' alleged misconduct, the briefcase search occurred during the concededly lawful automobile search, and the defendants did have information that Shields had engaged in serious misconduct. *Biehunik* states that the special interest in police integrity may justify work-related searches and seizures of police officers that might otherwise be unlawful. We conclude that in balancing all the relevant factors—the search's intrusiveness, the search's work-related nature, and the special interest in police integrity—the defendants could have reasonably concluded that the briefcase search was reasonable, and therefore lawful. Thus, the defendants are immune from liability for damages for searching Shields' briefcase.

### III.

Shields finally asserts that the district court erred in dismissing Count II of his complaint, which alleged that Hopper, on direct orders from Burge, pressured Shields' psychologist into changing his diagnosis that Shields needed a medical leave of absence. According to Shields, Hopper's and Burge's actions violated his constitutional right to privacy.

The Supreme Court has held that the Constitution protects "certain areas or zones of privacy," based upon a substantive concept of personal liberty the Court has found in the Fourteenth Amendment. See, e.g., *Whalen v. Roe*, 429 U.S. 589, 598–99 n. 23, 97 S.Ct. 869, 875–76 n. 23, 51 L.Ed.2d 64 (1977); *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed. 2d 147 (1973). In *Whalen*, the Court stated that this Fourteenth Amendment privacy right protects two different kinds of interests: "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions." 429 U.S. at 599–600, 97 S.Ct. at 876. Other courts of appeals have characterized these two interests as the "confidentiality" and "autonomy" strands of the privacy right. See *Plante v. Gonzales*, 575 F.2d 1119, 1128 (5th Cir.1978); *Barry v. City of New York*, 712 F.2d 1554, 1558–59 (2d Cir.1983); see also *Borucki v. Ryan*, 827 F.2d 836, 840 (1st Cir.1987).

Shields' complaint contains no hint that his psychologist revealed any confidential information to the defendants or even that the defendants tried to extract confidential information from the psychologist. Likewise, Shields has not argued in this court that the defendants received confidential information from the psychologist or in any other way violated his right to confidentiality. Therefore, no confidentiality claim is before us.

Shields' argument seems to focus on his right to autonomy in decisionmaking. Shields asserts that the defendants violated his right to privacy because they interfered with the decision Shields and his psychologist had reached (i.e., that a medical leave of absence was necessary). Although Shields does not explicitly say so, the logical implication from his argument is that by interfering with the psychologist's diagnosis, the defendants violated Shields' right to seek professional help from that psychologist, and therefore violated his right to autonomy in making an important decision.

■ We need not decide whether the facts Shields has alleged and argued state

a claim. Underlying Shields' claim is the assumption that the constitutional right to privacy protects the decision to seek professional help from a psychologist or psychiatrist. Based on the case law existing at the time Hopper allegedly pressured the psychologist into changing his diagnosis (July 1985), it was not clearly established that the right to privacy protected that decision. Therefore, qualified immunity shields the defendants from damages on Count II.[2]

The Supreme Court has never fully defined the privacy right's exact nature and scope. The Court and this court have noted that the right to privacy protects only those personal rights that are "fundamental" or "implicit in the concept of ordered liberty." *Roe v. Wade*, 410 U.S. at 152, 93 S.Ct. at 726; *McElrath v. Califano*, 615 F.2d 434, 441 (7th Cir.1980); see also *Whalen*, 429 U.S. at 598–99 n. 23, 97 S.Ct. at 875–76 n. 23. So far, the Supreme Court has found that the right to privacy includes rights to make decisions related to certain family-related matters, including marriage, procreation, abortion, contraception, family relationships, and child rearing and education. See *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). However, at the time the defendants allegedly pressured Shields' psychologist into changing his diagnosis, the Court had not extended the Fourteenth Amendment right to privacy beyond these family-related concerns. See *Borucki*, 827 F.2d at 839.

We have found no case from this court before July 1985 holding that the right to privacy protects the right to make decisions outside the traditional family-related areas the Supreme Court cases have dealt with. Other courts of appeals had held that the confidentiality strand protected information regarding activities outside the family-related concerns discussed in the Supreme

Court cases, including financial, medical, and other personal information. See, e.g., *Barry*, 712 F.2d at 1559; *United States v. Westinghouse*, 638 F.2d 570, 576–80 (3d Cir.1980); *Fadjo v. Coon*, 633 F.2d 1172, 1175–77 (5th Cir.1981).[3] But not all courts agreed with this conclusion. In *J.P. v. DeSanti*, 653 F.2d 1080 (6th Cir.1981), the Sixth Circuit held that the Constitution does not encompass a general right to confidentiality in personal information outside the family-related areas established in the Supreme Court's cases.

Even assuming complete agreement regarding the right to confidentiality, the confidentiality cases would not clearly establish that the right to privacy encompassed any interest in autonomous decision-making outside the family-related areas. A number of court of appeals cases have expressly or implicitly distinguished between the confidentiality and autonomy strands of the right to privacy. Those cases can reasonably be read to suggest that the confidentiality strand is broader than the autonomy strand. See, e.g., *Fraternal Order of Police v. Philadelphia*, 812 F.2d 105, 114 n. 5 (3d Cir.1987); *Barry*, 712 F.2d at 1559; *DuPlantier v. United States*, 606 F.2d 654, 669–70 (5th Cir.1979). In *Plante v. Gonzales, supra*, the Fifth Circuit found that while a financial disclosure law implicated the confidentiality strand of the right to privacy, it did not implicate the autonomy strand, in large part because it did not adversely affect decisionmaking in any family-related areas such as marriage, contraception, or child rearing. See *id.* at 1128–32. And in *Fadjo v. Coon, supra,* the Fifth Circuit expressly noted that the interest in confidentiality "is broader in some respects" than the interest in autonomy, and seemed to expressly limit the autonomy strand to decisions relating to family-related concerns. 633 F.2d at 1175.

---

**2.** Although the defendants did not argue qualified immunity regarding Count II in this court, they did argue it below. We may affirm the district court's decision on any ground that the record fairly supports and the appellee has not waived below. *Diliberti v. United States*, 817 F.2d 1259, 1262 (7th Cir.1987).

**3.** See also *Pesce v. J. Sterling Morton High School Dist. 201*, 830 F.2d 789 (7th Cir.1987), a case decided well after the defendants' actions in this case.

The Ninth Circuit has determined that the constitutional right to privacy protects communications between a psychotherapist and his patient, and did not distinguish between confidentiality and autonomy. *Caesar v. Mountanos,* 542 F.2d 1064, 1067 & n. 9 (9th Cir.1976). Likewise, there are district court cases that can be read as recognizing that the privacy right's autonomy strand protects the decision to seek psychological or psychiatric help. See *Hawaii Psychiatric Society v. Ariyoshi,* 481 F.Supp. 1028, 1039 (D.Haw.1979); *Lora v. Board of Education,* 74 F.R.D. 565, 569–74 (E.D.N.Y.1977). However, given the cases from other circuits distinguishing confidentiality and autonomy and seemingly limiting the autonomy interest to the family-related decisions mentioned in the Supreme Court opinions, we cannot say that *Mountanos* and the district court cases clearly established that the privacy right's autonomy strand protects the decision to seek psychological or psychiatric help. Cf. *Borucki,* 827 F.2d at 848 (given split in the circuits over the question, the court concluded that it was not clearly established that disclosing a confidential psychiatric report would implicate a constitutional privacy right); *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986) ("The State of Illinois is not bound to comply with every constitutional ruling by every district judge in the United States").

We conclude that it was not clearly established at the time of the defendants' actions here that Shields had a constitutionally protected right to autonomy in deciding to seek psychological counseling. Both the Supreme Court and this court had stated that the constitutional right to privacy applies only to "fundamental" rights that are "implicit in the concept of ordered liberty." *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726; *McElrath,* 615 F.2d at 441. Deciding which rights are so "fundamental" is a difficult job for a court, let alone a state police officer. Cf. *DeSanti,* 653 F.2d at 1090 ("Inferring very broad 'constitutional' rights where the Constitution itself does not express them is an activity not appropriate to the judiciary"); *Plante,* 575 F.2d at 1129 (the term "implicit in the concept of

ordered liberty" is not very helpful in determining exactly what the privacy right's autonomy branch protects). Given the lack of guidance from the Supreme Court beyond the cases involving family-related decisions, and the mixed signals from the courts of appeals, it could not have been "apparent," *Anderson,* 107 S.Ct. at 3039, to the defendants that they were violating Shields' constitutional privacy rights by pressuring his psychologist to change his diagnosis.

For the reasons stated above, we affirm the district court's decision.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I join fully in the admirable Sections I and II of the majority opinion. These analyses of the fourth amendment problems presented here are balanced and insightful and I think fairly reflect whatever may serve as relevant case law.

In addition, I agree with the result reached in Section III. I write separately only to suggest additional dimensions of the allegations of apparently malicious interference in a psychotherapeutic relationship. If we accept the truth of Shields' claims (as we must at this early stage of the litigation), there may have been gross abuse of official authority, for no other reason than to force Shields to resign. I think that state tinkering with the intimate bond of psychotherapy may well have constitutional dimensions.

In *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), addressing the perhaps unattractive right of citizens to possess obscene materials in the privacy of their own homes, the Supreme Court made a powerful statement:

[A]lso fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his

intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. *They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations.* They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man." *Olmstead v. United States,* 277 U.S. 438, 478 [48 S.Ct. 564, 572, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting).

These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases—*the right to satisfy his intellectual and emotional needs in the privacy of his own home....* If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. *Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.*

... Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.

*Id.* 394 U.S. at 564–66, 89 S.Ct. at 1247–49 (emphasis added; other citations omitted). Although *Stanley* could have been decided on the narrow first amendment ground that the state could not prevent the receipt of information, its holding is in fact considerably broader: the state may not attempt to control the minds of its citizens, whether the targeted thoughts and feelings are intellectual or emotional.[1]

This "freedom to be one's self," which encompasses spiritual, emotional and intellectual thoughts and feelings, is protected, at least in some contexts, by a constitutional right of privacy, which may only be overriden by a compelling state interest. Unimpeded access to psychiatric counseling may well be a part of one's right to autonomously define one's own personality. The psychiatrist-patient relationship is not protected by a right of privacy for its own sake; instead, this relationship enjoys protection only because medical assistance may sometimes be necessary to individual integrity and freedom.

There is a long line of cases which have specifically recognized a constitutionally protected right to independent control of one's own psychiatric treatment. For example, in *Aden v. Younger,* 57 Cal.App.3d 662, 129 Cal.Rptr. 535 (1976), a group of physicians and psychiatric patients challenged a California statute which limited the availability of electroconvulsive therapy and psychosurgery. The court found that the challenged statute infringed a constitutionally protected right to control the course of one's own psychiatric treatment.

[T]he right to privacy [ ] clearly includes privacy of the mind.

The right to be free in the exercise of one's own thoughts is essential to the exercise of other constitutionally guaranteed rights.... Here the state has sought to control neither what is thought by mental patients, nor how they think. Rather, the state is attempting to regulate the use of procedures which touch upon thought processes in significant ways, with neither the intention nor the effect of regulating thought processes, per se....

*Freedom of thought is intimately touched upon by any regulation of procedures affecting thought and feelings....* [T]he state has put procedural and substantive obstacles in the path of those who both need and desire certain forms of treatment, and in that way their

---

1. The grounding of *Stanley* in one's right to control one's own emotional and intellectual life was recognized in *United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), which refused to extend *Stanley* to the commercial distribution and sale of pornography: "The focus of [*Stanley*] was on freedom of mind and thought and on the privacy of one's home." *Id.* at 356, 91 S.Ct. at 1412; *see also Whalen v. Roe,* 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 876 n. 24, 51 L.Ed.2d 64 (1977) (right of privacy comprehends "the right of an individual to be free in action, thought, experience, and belief from governmental compulsion").

freedom of thought remains impaired because they cannot get treatment.... Public exposure, or even disclosure to limited numbers of government representatives, may have a chilling effect on patients' efforts to undergo these treatments, thereby restricting their freedom of thought.... Although the reasons for such denials [of treatment] may be the patients' own best interests, such regulation must be justified by a compelling state interest.

*Id.* at 679–80, 129 Cal.Rptr. at 546–47 (emphasis added; citations omitted). Thus *Aden* recognized that access to, and control of, certain sorts of psychiatric treatment is protected by a right of privacy guaranteeing integrity and freedom of thought and feeling. *See also, Northern California Psychiatric Soc'y v. City of Berkeley,* 178 Cal.App.3d 90, 104–06, 223 Cal.Rptr. 609, 614–15 (1986) (absolute ban on electroconvulsive therapy violates patient's right to select appropriate means of psychiatric treatment); *Lillian F. v. Superior Court,* 160 Cal.App.3d 314, 321–22, 206 Cal.Rptr. 603, 607 (1984).

The most extensive body of case law recognizing individual autonomy in psychiatric treatment involves an involuntarily committed individual's right to refuse psychiatric treatment, particularly electroconvulsive therapy or the administration of psychotropic drugs. For example, recognizing that "antipsychotic medication has the potential to infringe upon an individual's freedom of thought," the Fourth Circuit recently held that compulsory psychiatric treatment infringed upon the individual's rights of privacy, and freedom of thought and personality. *United States v. Charters,* 829 F.2d 479, 489 (4th Cir.1987).

Where, as here, medication which is potentially mind altering is concerned, the threat to individual rights goes beyond a threat of physical intrusion and threatens an intrusion into the mind. The interest in preventing intrusions into one's mind has been recognized as worthy of constitutional protection ...

The impact of antipsychotic medication upon the mind may be sufficient to undermine the foundations of personality. Such mind altering medication has the potential to allow the government to alter or control thinking and thereby to destroy the independence of thought and speech so crucial to a free society. "The power to control men's minds is wholly inconsistent not only with the philosophy of the first amendment but with virtually any concept of liberty."

*Id.* at 492 (citations omitted).[2]

The lesson of *Aden* and the right-to-refuse-treatment cases is straightforward: psychiatric treatment involves the most in-

---

**2.** *Accord, Walters v. Western State Hosp.,* 864 F.2d 695, 697–98 (10th Cir.1988); *Bee v. Greaves,* 744 F.2d 1387, 1392–93 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); *Mackey v. Procunier,* 477 F.2d 877, 878 (9th Cir.1973); *Rogers v. Okin,* 478 F.Supp. 1342, 1369 (D.Mass.1979), *aff'd in relevant part,* 634 F.2d 650, 653 (1st Cir.1980) (it is "an intuitively obvious proposition" that "a person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to ... the administration of antipsychotic drugs"), *vacated and remanded on other grounds sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), *on remand, Rogers v. Okin,* 738 F.2d 1 (1st Cir.1984); *Rennie v. Klein,* 462 F.Supp. 1131, 1144–45 (D.N.J.1978), 476 F.Supp. 1294, 1307 (D.N.J.1979), *modified and remanded on other grounds,* 653 F.2d 836 (3d Cir.1981) (*en banc*), *summarily vacated and remanded,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *reaff'd on remand,* 720 F.2d 266, 269 (3d Cir. 1983) (*en banc*); *Souder v. McGuire,* 423 F.Supp. 830, 832 (M.D.Pa.1976); *Riese v. St. Mary's Hosp. & Medical Center,* 196 Cal.App.3d 1388, 243 Cal.Rptr. 241, 250 (1988); *In re K.K.B.,* 609 P.2d 747, 750–51 (Okla.1980); *Superintendent of Belchertown v. Saikewicz,* 373 Mass. 728, 739, 370 N.E.2d 417, 424 (1977); Winick, *Legal Limitations on Correctional Therapy and Research,* 65 Minn.L.Rev. 331, 345–47 (1981); Rhoden, *The Right to Refuse Psychotropic Drugs,* 15 Harv. C.R.–C.L.L.Rev. 363, 382–88 (1980); Plotkin & Gill, *Invisible Manacles: Drugging Mentally Retarded People,* 31 Stan.L.Rev. 637, 660–62 (1979); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment,* 72 NW.U.L.Rev. 461, 493 (1977). *Cf. Gorman v. University of Rhode Island,* 646 F.Supp. 799, 814 (D.R.I.1986) (conditioning readmission of suspended student on completion of course of psychiatric counselling violates student's right of privacy, to "deci[de] whether or not to seek psychiatric care or treatment"), *rev'd in part on other grounds,* 837 F.2d 7 (1st Cir. 1988).

timate and personal aspects of one's personality—aspects which *define* the individual in a unique and spiritual way. Since the state may not control one's thought processes directly, it may not, without a compelling interest, interfere with the psychiatric treatment that is needed for a healthy mental and emotional life. In the present case, Shields alleges that the defendants pressured his psychiatrist into changing his diagnosis of Shields' condition, thereby denying Shields the course of treatment (medical leave) which the psychiatrist believed necessary to heal his patient. To my mind, this sort of direct governmental interference with the treatment modality prescribed by a psychiatrist may very well violate a right of privacy.

In *Aden* and the right-to-refuse-treatment cases, the court had to weigh a patient's undeniable privacy right against a considered legislative, judicial or professional determination that certain forms of psychiatric treatment were or were not beneficial to the subject. But the present case is not complicated by the need to weigh against the individual's right any "compelling" state interest. For in this case the interference with Shields' relationship with his psychiatrist was purely gratuitous, apparently serving no governmental "interest" other than the desire to railroad a suspect worker out of his government job. Therefore the allegations in Count II seem to me to assert a violation of Shields' right of privacy.

Although state intrusion into a psychotherapeutic relationship without justification can very well violate the constitution, the right to be free of this interference in the circumstances immediately before us seems not to be well established. I therefore join the majority's conclusions on qualified immunity. I do so in the belief, however, that the charges of psychiatric manipulation are probably the most serious of those presented by this case.