Robert JACKSON, Plaintiff–Appellee,

v.

Richard J. ELROD, et al.,
Defendants–Appellants.

No. 88–1867.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1988.

Decided Aug. 7, 1989.

Robert D. Allison, Chicago, Ill., for Robert Jackson.

Madeleine S. Murphy, Asst. State's Atty., Chicago, Ill., for Richard J. Elrod, Sheriff, Philip H. Hardiman, Robert N. Glotz, Directors, Leon Cornelious, William Sullivan, John Blanks, Superintendents.

Before COFFEY, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

Robert Jackson was a pretrial detainee in the Cook County Jail for two extended periods totalling 959 days. During that time correctional officials prevented him from receiving hard-bound books, mostly sent directly from the publisher. As a result of that deprivation, and as a result of the failure to notify him of the deprivation, Jackson sought compensatory and punitive damages under 42 U.S.C. § 1983 against various Cook County correctional officials. After the district court ruled that it was unconstitutional to deprive Jackson of his hard-bound books and to not notify him of the deprivation, the correctional officials moved for summary judgment, claiming qualified immunity. The district court denied their motion, and the correctional officials appeal. We affirm.

## Background [1]

From August 1980 until June 1982, and from January 1985 until June 1986 plaintiff Robert Jackson was under pretrial detention in the Cook County Jail. Both extended detentions, totalling at least 959 days, were exacerbated by the fact that Jackson was apparently a chronic alcoholic. The Cook County Department of Corrections (DOC), which operated the jail, provided no treatment for alcoholism nor offered any self-help resources. Between 1980 and

---

**1.** In addition to the opinion now on review, the district court has published two previous opinions in this case. See *Jackson v. Elrod,* 655 F.Supp. 1130 (N.D.Ill.1987) (*Jackson I*), and *Jackson v. Elrod,* 671 F.Supp. 1508 (N.D.Ill.1987) (*Jackson II*). The facts as we have them are set out in more detail in those opinions and we incorporate them here.

1982 Jackson submitted numerous requests for counseling, but received none. Nor, after many requests, did he receive any access to the jail's general library, which apparently contained literature on treatment for alcoholism.

While in detention, in an apparent personal effort to address his self-described addiction, Jackson mail-ordered a number of self-help books, many of which were hard-bound and would be sent directly from the publisher. But Jackson never received most of these books because the prison officials returned them to the sender rather than delivering them to him. Most of the time Jackson did not even receive notification of the fact that the books had been returned. Ultimately, the prison officials told him that hard-bound books posed a security problem and were unacceptable in the jail setting. They rejected Jackson's suggestion that they remove the hard covers before delivering the books to him because the process was too time-consuming and cumbersome. Jackson sued under § 1983 claiming that the deprivation of the hard-bound books violated his First and Fourteenth Amendment rights and the failure to notify him of that deprivation violated his due process rights under the Fourteenth Amendment.

*District Court Proceedings*

Initially the defendants, who included the Cook County Sheriff and various other correctional officials,[2] moved that the case be dismissed because it was time-barred and failed to state a claim upon which relief could be granted. Among other things, defendants claim that they had no personal involvement in the deprivation of the books. Judge Marshall granted the motion with respect to any individual liability of Cook County Sheriff Richard J. Elrod, DOC Director Hardiman and DOC Assistant Director Glotz. They remained in this action in their official capacities only. He denied the motion with respect to jail superintendents Blanks, Cornelius, Patrick, and Sullivan. 655 F.Supp. at 1139.

After discovery, Jackson moved for partial summary judgment against Elrod, Hardiman, Glotz, Blanks, and Sullivan for their liability "for alleged policies of barring detainees' receipt of all hard-cover books and of not informing the detainees of such rejections." 671 F.Supp. at 1509. The court held that the defendants failed "to demonstrate a reasonable relationship between their blanket ban on hard-bound books, or their rejection of books from reputable suppliers, and any legitimate jail interest. The practices represent an exaggerated response to a minimal security risk; thus they violate the Constitution." 671 F.Supp. at 1511. The court further held that "detainees should receive notification of rejection and be given an opportunity to object.... Thus, we hold the current policy [of non-notification] also violates the Constitution." *Id.* at 1512.

Defendants [3] then moved for partial summary judgment, claiming qualified immunity protected them from individually paying damages for the two Cook County Jail policies that the district court found unconstitutional. The court, in applying the "objective reasonableness" standard set out in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), concluded under *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the "defendants had no legitimate reason for banning hard-bound books, and thus acted arbitrarily when they rejected books sent to Jackson. Their conduct clearly violated the law established in *Bell,* therefore the doctrine of qualified immunity does not protect them from liability for damages for the book rejections." *Jackson v. Elrod,* No. 86 C 1817, mem. op. at 10, 1988 WL 33823 (N.D.Ill. Apr. 5, 1988) (*Jackson III*).

---

2. Defendants originally named include Cook County Sheriff Richard J. Elrod, Cook County DOC Director Phillip H. Hardiman, Cook County DOC Assistant Director of Security Robert M. Glotz, and four superintendents of the Cook County Jail division where Jackson was held, John Blanks, Leon J. Cornelius, Roy Patrick, and Willard Sullivan.

3. The district court concluded that it would apply its decision to all defendants still exposed to personal liability: namely, Glotz, Hardiman, Blanks, Sullivan, Patrick, and Cornelius. *Jackson v. Elrod,* No. 86 C 1817, mem. op. at 4 (N.D.Ill. Apr. 5, 1988) (*Jackson III*).

Defendants also claimed qualified immunity for their alleged failure to notify Jackson that they had rejected and returned the books addressed to him. Following *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and *Aikens v. Jenkins,* 534 F.2d 751 (7th Cir.1976), the district court held that "the law in 1980 was clear that the Fourteenth Amendment required defendants to notify Jackson that they had rejected books sent to him. Defendants thus are not immune from paying damages for their failure to afford Jackson minimal procedural safeguards." *Id.* at 11.

*Standard of Review*

■ While 28 U.S.C. § 1291 vests the courts of appeals with jurisdiction over appeals only from "final decisions" of district courts, an order denying qualified immunity is immediately appealable. *Mitchell v. Forsyth,* 472 U.S. 511, 524, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985). Defendant's entitlement to qualified immunity is not a mere defense to liability, but an immunity from suit itself. *Id.* at 526–27, 105 S.Ct. at 2815–16. Thus the court's denial of qualified immunity on both claims is appealable at this juncture.

This court reviews de novo a district court's summary judgment determination. *Central States, Southeast and Southwest Areas Pension Fund v. Jordan,* 873 F.2d 149, 152 (7th Cir.1989). Summary judgment will be granted under Fed.R.Civ.P. 56 only when no genuine issue of material fact exists and when the movant is entitled to judgment as a matter of law. In reviewing the denial of a motion for summary judgment as here, we must review the record and draw inferences from it in the light most favorable to the party opposed to the motion. *Morgan v. Harris Trust & Savings Bank Chicago,* 867 F.2d 1023, 1026 (7th Cir.1989). Summary judgment is not defeated merely because issues of motive or intent are involved. *Id.* This court, like a district court deciding a summary judgment motion, does not exercise discretion in the summary judgment decision. Upon appeal this court looks for any genuine issue of material fact underlying the controversy, and whether the substantive law has

been properly applied by the district court. *Id.,* § 56.27[1], at pp. 850–52. 6 Moore & Wicker, *Moore's Federal Practice* § 56.23, at p. 786 (2d ed. 1988).

*The Immunity Defense*

At oral argument counsel for appellants (perhaps "going beyond the record") reported that a "compromise" policy now in effect notifies inmates when they receive hard-cover books, granting inmates the choice between delivery with their covers torn off, or a return to sender. At the same time she acknowledged that the qualified immunity aspect of this appeal deals exclusively with the hard-cover book ban itself, and that they were not appealing the district court's decision on the non-notification policy. Appellants now concede that it was clearly established that the inmates should have been notified of the return of the hard-cover books.

■ Thus the sole issue before us in this appeal is whether the defendants-appellants are entitled to assert qualified immunity as a defense against paying Jackson damages arising from the hard-cover book ban. That is, we must determine whether the defendants' actions identified by the district court as violating the Constitution violated clearly established constitutional standards in 1980, when the violations began.

Public officers require some form of immunity from suits for damages. This insulates them from undue interference with their duties and from the potentially disabling threat of liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). Immunity is justified not by the person to whom it attaches but by the functions it advances. *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988). At issue is the function of internal prison security versus a prisoner's right to receive literature.

The law recognizes immunity defenses of two kinds. For officials whose constitutional status or special functions demand total protection from suit there is the defense of absolute immunity. The absolute immunity of judges in their judicial functions and legislators in their legislative

functions is well-settled. Absolute immunity extends to certain executive officials such as prosecutors, executive officers engaging in adjudicatory functions, and of course the President of the United States. *Harlow,* 457 U.S. at 807, 102 S.Ct. at 2732. Absolute immunity is not applicable here.

Qualified immunity reflects a balance between the importance of a damages remedy to protect citizens' rights and the need to shield officials required to exercise their discretion in the exercise of authority. *Harlow,* 457 U.S. at 807, 102 S.Ct. at 2732. An official, when exercising his discretion, however, must not violate clearly established rights that he reasonably should have known. *Auriemma v. Montgomery,* 860 F.2d 273, 279 (7th Cir.1988); *Shields v. Burge,* 874 F.2d 1201, 1205 (7th Cir.1989). The question of qualified immunity is an issue of law. *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.1988).

The defendants here claim qualified immunity because the case law did not clearly establish that it was a denial of a pretrial detainee's First Amendment rights to ban his receipt of all hard-back books, regardless of the source, in the interest of prison security and in the interest of preventing the import of any contraband hidden within the books. We need to look at the "objective reasonableness" of those acts in light of federal judicial precedent. We do so recognizing that this is not a "content" regulation dispute. Cf. *Thornburgh v. Abbott,* ___ U.S. ___, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).[4]

The modern law holds that prison inmates retain various constitutional rights. While courts no longer take a "hands-off" approach to problems of prison administration, we recognize that prisoners' constitutional rights are truncated, and that they may be curtailed as necessary to ensure security. *Johnson–Bey v. Lane,* 863 F.2d 1308, 1310 (7th Cir.1988). The Supreme Court recently has reaffirmed that it grants considerable deference to the decisions of prison administrators who regulate the relationships between outsiders and prisoners in the interest of security. *Abbott,* 109 S.Ct. at 1878–79.

The Supreme Court and the Seventh Circuit have spoken on the issues of denying hardback books to persons held after being charged with a crime but before trial. *Bell* examined a "publishers only" rule which, as a security measure, prohibited inmates from receiving hardcover books not mailed directly from publishers, book clubs, or bookstores. *Kincaid v. Rusk,* 670 F.2d 737 (7th Cir.1982), involved a sheriff's denial to pretrial detainees of certain reading material, including hardback books, because they were used to jam toilets and were potentially used as lethal propellants. While by no means identical to the case before us, *Wolfish* and *Kincaid* represent the "clearly established" law that we must apply in determining the qualified immunity of the defendants when they failed to deliver the hardback books to Jackson.

*Wolfish* sets the standard for balancing the constitutional rights of pretrial detainees against the difficult responsibility bestowed upon officials who run prisons. Hardcover books are suspect when received at an institution because narcotics, money and weapons can be hidden within their bindings. *Wolfish,* 441 U.S. at 550–51, 99 S.Ct. at 1880. *Wolfish* acknowledges that there is a mutual accommodation between the needs and objectives of institutions holding pretrial detainees and those constitutional provisions protecting persons being held. Detainees cannot enjoy the full range of freedoms of unincarcerated persons. Safeguarding institutional security and preserving discipline can demand construction of the retained constitutional rights of pretrial detainees. *Id.* at 546, 99 S.Ct. at 1877–78.

Corrections officers controlling pretrial detainees are afforded broad deference in their adoption and implementation of procedures needed to ensure internal discipline and security. *Id.* at 547, 99 S.Ct. at 1878.

---

4. Jackson cites to this court numerous Illinois state statutes and regulations limiting administrative discretion, and suggesting defendants did act unreasonably in failing to deliver his books to Jackson. But such state authorities are not dispositive in this First Amendment case. We therefore confine our attention to First Amendment authorities.

Courts prefer not to tell prison officials how to run a prison and defer to the informed discretion of such administrators, both because of administrative complexities and because management of the pretrial detainees is entrusted to the executive and legislative branches, not to the judiciary. *Id.* at 546 n. 29, 99 S.Ct. at 1878 n. 29. Absent substantial evidence indicating officers have erred, courts defer to their expertise. *Id.* at 547–48, 99 S.Ct. at 1878–79. Cf. *Abdul–Wadood v. Duckworth,* 860 F.2d 280, 290 (7th Cir.1988) (Coffey, J., concurring in the result in part and dissenting in part). But in the face of such an error, courts are obliged to intervene.

In *Wolfish,* the Court recognized that the limited restriction against the receipt of hardback books unless mailed directly from publishers, bookstores, or book clubs was a rational response by prison officials as security against smuggling contraband. *Wolfish,* 441 U.S. at 550–51, 99 S.Ct. at 1880. But several other factors—factors not present here—led the Court to its conclusion that the restriction did not violate the First Amendment. Importantly, there were alternative means of obtaining the restricted reading material, such as a relatively large prison library as well as promptly delivered magazines and soft-bound books. Also, pretrial detainees were (with some exceptions) kept a maximum of 60 days. *Id.* at 552, 99 S.Ct. at 1881.

Jackson, however, was confined for two extended periods totalling 959 days. Not only was he denied hard-bound books sent from publishers, he claims there was no other source (*e.g.* a prison library or available soft-bound books) for literature addressing his alcohol problem. The court in *Wolfish* concluded that under the facts of that case the rule applied was a "reasonable time, place and manner" regulation necessary to further significant government interests. However, the restrictions applied to Jackson's receipt of literature go well beyond those permitted in *Wolfish.* He had no alternate source for the information he ordered and the officials made no

effort to get the books to him by inspecting or removing the hard covers.

In *Kincaid, supra,* the Seventh Circuit dealt with a somewhat different problem. The sheriff was more concerned with what inmates did with the books once they got them as opposed to what might be hidden "under cover." [5] Although *Kincaid* dealt with several First Amendment issues involving the restrictions on literature, when focusing strictly on the restrictions for security reasons, the Court held that "maintenance of security and discipline do not justify the wholesale prohibition of ... hard-bound books. Although deference to the judgment of prison officials is required in most instances, ..." it is not proper when it greatly affects First Amendment rights of a pretrial detainee. *Kincaid,* 670 F.2d at 745.

Defendants insist that *Kincaid* does not affirm law clearly established by *Wolfish* in limiting delivery of hard-bound books to pretrial detainees. Rather, defendants claim *Kincaid* actually justifies hard-bound book bans if the underlying institutional policy is to prevent smuggling contraband. Yet *Kincaid* specifically refers to *Wolfish* when it states that a ban on hard-bound books may be reasonable to prevent smuggling contraband, and summarizes the rule which bans hard-bound books except those received directly from the publisher.

The defendants banned hard-bound books sent to Jackson directly from the publisher. The Supreme Court clearly stated in 1979 that the hard-back restriction was permitted because of the "publisher only" exception—an exception that the defendants refused to condone. Nor would they even accommodate a compromise by tearing off the hard covers—an admittedly cumbersome task *Wolfish* did not require for hard-bound books sent from sources *other than* publishers, book clubs, or bookstores. *Wolfish,* 441 U.S. at 550, 99 S.Ct. at 1880.

---

**5.** The sheriff in *Kincaid* also restricted publications based on their content (pornography), damage from sticking pictures on the wall, use in jamming toilets, and use as propellants, and other reasons not before us.

*Wolfish* and *Kincaid* between them strongly signal that defendants here were on notice under clearly-established case law that their hard-cover book prohibition was unconstitutional. The broad teachings of *Wolfish* and of *Kincaid* are that the courts must be protective of the First Amendment rights of pretrial detainees. Defendants did not balance those rights with its policy of preventing smuggled contraband to people like Jackson. Rather, these prison officials in effect engaged in "the wholesale prohibition of ... hard-bound books"; this is unjustified by their alleging the "maintenance of security and discipline." *Id.* at 744. An official action cannot be protected by qualified immunity merely because "the very action in question" has not yet been held unlawful. *Anderson,* 107 S.Ct. at 3039.

Penal regulations impinging upon inmates' constitutional rights are valid when reasonably related to legitimate penological interests. *Abbott,* 109 S.Ct. at 1879–81. *Wolfish* and *Kincaid,* like our opinion today, heed these valid security and disciplinary needs of penal authorities. But they do not justify deleting the constitutional rights of pretrial detainees. The legitimate state interests here could have been satisfied, as they now are, by simply removing the covers of the hard-bound books. Or, as in *Wolfish,* they could have delivered books from publishers, which present much less risk. But that remedial measure was expressly rejected by the prison officials. The judgment of the district court is

AFFIRMED.