THE HAMMOND v. CENTRAL R. CO. OF NEW JERSEY et al.

CENTRAL R. CO. OF NEW JERSEY v. DELAWARE, L. & W. R. CO.

District Court, E. D. New York. November 15, 1929.

Park, Mattison & Lynch and Henry E. Mattison, all of New York City, for libelant Hammond.

Macklin, Brown, Lenahan & Speer and J. Dudley Eggleston, all of New York City, for libelant Central Railroad Company of New Jersey.

John E. Morrissey, of New York City, for Delaware, Lackawanna & Western Railroad Company.

INCH, District Judge. Libelant's barge was run into and damaged by the ferryboat Westfield, owned by the Central Railroad Company of New Jersey, and has sued that company to recover the damages sustained. The Central Railroad Company has impleaded the Delaware, Lackawanna & Western Railroad Company. The Central Railroad Company of New Jersey has also brought a separate suit to recover its own damage against the Delaware, Lackawanna & Western Railroad Company. By consent both suits were tried together, as they relate to the same accident and the facts are the same in both.

There is no question about the right of libelant to succeed. The only issue is whether one or both of the railroad companies

were negligent. If the facts on three points can be found, the solution of the question of this liability will naturally follow. These points are: Did those in charge of the ferryboat Westfield see the barge in sufficient time to reasonably avoid the collision? Did the failure to obey the inland rule on the part of the Delaware, Lackawanna & Western Railroad tugs bring about or contribute to bring about the collision? Was there negligence proved on the part of the Delaware, Lackawanna & Western Railroad tugs, which caused the accident aside from this failure to obey the rules?

A brief summary of what occurred is as follows: On December 21, 1920, the barge Connecticut, belonging to libelant, had received injuries in a collision in the lower Bay. She was loaded with 500 barrels of cement, placed near and at her stern, and 400 bags of flour, near her bow. She was the ordinary covered barge 106 feet long, flat bottom, with rake fore and aft. This collision had put her "down by the stern, so that the forward end was out of the water." In this condition she had been taken in charge by two of the Delaware, Lackawanna & Western Railroad tugs, the Scranton and the Hoboken. It is unnecessary to go further into the details of these prior circumstances. The weather was clear, with little or no wind. The tide had turned to strong ebb.

The collision we are interested in took place later, in broad daylight, about 1 p. m., in the North River, about off the Jersey Central ferry slips, Communipaw. These two tugs had been joined by another tug of the Delaware, Lackawanna & Western Railroad Company, the Bernardsville, and together they had proceeded to slowly tow the barge up towards the North River. The Scranton had run two hawsers, and the Hoboken one, to the bow end of the barge. These hawsers were about "150 to 175 feet long."

When these tugs "struck a point off Ellis Island, the barge went down by the stern and rolled over towards the west shore, and some of her load was dumped out. The three hawsers remained fast. All of the bottom of the barge was exposed. The color of the wood was a battleship gray." In other words, the barge completely capsized and was partially submerged. Her cabin or house and most of her sides were down in the water, and even a considerable portion of the towing hawsers were buried in the water. The cargo that went out would seem to have been mostly the bags of flour. The heavy cement at her stern dragged it further down than the bow. Ac-

cording to the witnesses for the Delaware, Lackawanna & Western Railroad Company, she had only between three and four feet at the bow and two feet at the stern; while other witnesses testified, more accurately, I think, to her being slightly above the level of the water, with the quick water from the two tugs rolling up and over her.

When the barge capsized, the Bernardsville took up a position in front of the Scranton and Hoboken, whose hawsers were still fast at the barge, and a line of "some 15 fathoms" was run from the stern of the Bernardsville to the bow bitt of the Scranton. In this way they proceeded up the North River; the Bernardsville, 105 feet long, with a line to the Scranton "about 75 feet long;" the Hoboken and Scranton each about 100 feet long, with their hawsers to the barge about 145 feet long; and, finally, the barge, about 106 feet long. This made a total length from the stern of the Bernardsville to the stern of the barge of about 531 feet.

The course taken was up the Jersey side of the river, "close to the shore" (Griffin), or "about 100 or 125 feet away" (Conlen). In other words, there was no possibility of the ferryboat passing between the tugs and her ferry slip.

In the pilot house of the Bernardsville was Mr. Coogan, assistant manager of the marine department, in charge of the lighterage division, for the Delaware, Lackawanna & Western Railroad Company, who had taken the Bernardsville, when notified of the first trouble, and had gone down to the tugs Scranton and Hoboken. He seems to have been generally in charge of the tow. Burns, the captain of the Hoboken was a witness. Potter, captain of the Scranton, is dead.

Coogan testified quite fully, and among other things he says: "I first observed the Westfield when Burns blew him two whistles. She answered with two. She passed close by, not over 100 feet. The quick water from the Scranton and Hoboken was breaking over the barge. It made a regular crescent. I gave no further concern. The next I heard was the captain of the Scranton blowing an alarm. I could see the Westfield plainly. She was then swinging towards her ferry slip." He later testified: "I knew the Westfield was a Twenty-Third Street ferryboat and was bound for the ferry slip just below the point of collision." Coogan subsequently sought to change this testimony about the condition of the barge, and there seems to me to be other inaccuracies, both in his and in the testimony of other witnesses for the Del-

aware, Lackawanna & Western Railroad Company.

However, taking only the testimony of Coogan, we have the Westfield properly coming down the river with a strong ebb tide, intending to go into her slip at Jersey City, which was about the place of collision, all of which was known to Coogan in the head tug, which, with the other tugs, was coming up the river between the Westfield and her ferry slip, dragging behind them, at a distance of about 175 feet, this capsized and partially submerged barge loaded with cement. Yet not the slightest warning of any kind of the very apparent danger was given by any of these tugs to the Westfield, in case she should turn to go towards her slip, within 281 feet from the sterns of the tugs.

The very thing happened that ordinary prudence would seem to have indicated might happen. The Westfield, after she had apparently safely passed the sterns of these last two tugs, turned in to go, with the strong ebb tide, to her slip. She ran head on into this partially submerged barge, doing damage to both vessels.

█ This brings us to the three questions of fact first mentioned. The Delaware, Lackawanna & Western Railroad Company claims that the Westfield's captain could, with reasonable care, have seen the presence of the barge behind the tugs in ample time to avoid the collision. Of course, if this were found to be a fact, however careless the Delaware, Lackawanna & Western Railroad Company tugs were, it would not absolve the Westfield. I do not think, however, that this is a fact.

I much prefer the testimony of the Westfield's officers. This testimony is much more probable than to think that the experienced pilot of the Westfield, in broad daylight, seeing this partially submerged barge, should so carelessly direct the course of his ferryboat as to run into the middle of it. On the contrary, I believe him when he says: "I first noticed the tugs when I came down off the Pennsylvania ferry from the Jersey City side. One tug was ahead of two others, about 50 to 100 feet, with a line from her to the other tugs; they were coming up the river straight, close to the shore. I saw nothing whatever to show that they were towing any submerged or partially submerged object. I looked to see if they had anything in tow, and came very close to the tug, about 100 feet. I saw nothing in tow of the tugs. Just as soon as I hauled around, I saw two lines leading down under the water; this was just as soon as I cleared the tugboats. I then rang four bells to go astern and blew the whistle. We struck about the time when I rang the bell. I was at the wheel all the time. I was on the starboard and the quartermaster was on the port side. We port our helm a little above our slip, when we are coming around with the ebb tide. I could see very little of the lines, about 25 feet."

On cross-examination his story was substantially the same. He again stated that the water was washing up over the barge, which was bottom up; that he could not see her until "I was almost on top of her." It should be remembered that the color of this barge was "a battleship gray," which in itself merges with the color of the water.

The wheelsman, Willett, testifies to about the same thing. He says: "The Westfield slowed down to one bell, and waited for the tugs to clear, so he could make his slip, and when we went to go to the sterns of the tugs to make the slip, and gave her full speed ahead, and just as he did he stopped his engine again, reversed full backwards, when he discovered what was there. It was a matter of a few seconds. I did not see the barge before we struck. There was nothing to obstruct my view. I would have seen the barge if she had been extending a foot or 2 or 3 above the water. I should say it was about 50 to 75 feet that we passed when we started to haul in."

Collen, master of a ferryboat that was laid up in a slip, saw the collision. He says the tug or barge passed about 100 or 125 feet away. "I saw the line leading down. I could not see what they were towing. I saw nothing extending up above the surface of the water. I did not see the barge when the Westfield struck her. When the tugs were abreast of me, I saw then that they were towing something submerged."

McNellis, master of a steam lighter that had overtaken these tugs and her tow, said, when he passed them about 100 feet away the only thing he could see "was the form of something square with a wash of water over it; that he couldn't see anything above the surface." There is other testimony along this line.

The only thing that has caused me to pause in discussing this particular question is the nonproduction of Maloney, who was said to be 70 years of age and ill in a hospital. He was the lookout on the lower deck of the ferryboat.

There are certain inferences that can sometimes be drawn from the nonproduction

of a material witness, but it does not seem to me, when I consider all the other satisfactory evidence offered by the Central Railroad Company of New Jersey, that any such inference, if any could be drawn, should be considered sufficient to overthrow the testimony of those in the pilot house of the ferryboat, who would seem to have been in a very much better position to see in time to avoid the collision, owing to the height of the pilot house, than one on the lower deck, whose view must necessarily have been obscured by the tugs. De Gregorio v. U. S. (C. C. A.) 7 F.(2d) 295.

Satisfied as I am that the proof of the negligence of those in charge of the tugs of the Delaware, Lackawanna & Western Railroad Company is plain, I think the court need not be too much concerned with considering any such inference, resting solely on the nonproduction of such a witness, who was ill and in a hospital. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519.

I therefore find that the master of the Westfield could not see the partially submerged barge by the exercise of reasonable care in time to avoid the collision. I think, therefore, that the Central Railroad of New Jersey is without fault.

This brings us to the two remaining questions concerning the negligence, if any, of those in charge of the Delaware, Lackawanna & Western Railroad Company's tug. The first would seem to be sufficient. It is conceded that none of the tugs obeyed Pilot Rule No. 1 for Inland Waters. This rule is as follows:

"Rule 1. *Rule for Signals to be Displayed by a Towing Vessel When Towing a Submerged or Partly Submerged Object upon a Hawser When No Signals are Displayed upon the Object Which is Towed.* The vessel having the submerged object in tow shall display by day, where they can best be seen, two shapes, one above the other, not less than six feet apart, the lower shape to be carried not less than ten feet above the deck houses. The shapes shall be in the form of a double frustum of a cone, base to base, not less than two feet in diameter at the center nor less than eight inches at the ends of the cones, and to be not less than four feet lengthwise from end to end, the upper shape to be painted in alternate horizontal stripes of black and white, eight inches in width, and the lower shape to be painted a solid bright red."

I have found that the barge was partially submerged, and in this condition was being towed by hawsers up the North River when the collision occurred. Those in charge of this tow displayed nothing which would indicate that they were towing a partially submerged barge. This rule was adopted by the executive committee of the Board of Supervising Inspectors on July 22, 1914, and approved by the Secretary of Commerce July 28, 1914, and adopted by the Board of Supervising Inspectors on January 20, 1915, and approved by the Secretary of Commerce on April 12, 1915, and is a safety and binding rule. The Transfer No. 8 (D. C.) 14 F.(2d) 448; The Perseverance (C. C. A.) 11 F.(2d) 527.

The contentions of the Delaware, Lackawanna & Western Railroad Company, according to the testimony of their witness Coogan, assistant manager of the marine department, would seem to be that they were excused from obeying the rule by reason of the emergency; in other words, that there was no thought that the barge would capsize or be partially submerged until it was too late to obtain the shapes, and that, of course, the barge could not then be abandoned; further, that such shapes are not a part of the standard equipment required of a tug in this harbor; and, finally, that this barge was not a partially submerged object.

It would seem, however, that when a reasonable rule like this is in existence that tugs who may be called upon to tow submerged objects might very well carry such shapes. This may not mean necessarily every tug, but would seem to apply to a powerful tug, such as the Bernardsville, which left for the purpose of rendering assistance, the extent of which was not then known, and where ample time existed in which to prepare before leaving her slip. It would also seem that knowledge of and a willingness to obey such safety rules can be considered a part of the standard equipment of those charged with the duty of seeing that such rules are obeyed.

Moreover, this rule does not necessarily impose in every case the hardship of having shapes, if that is a hardship, for it expressly provides, possibly for emergencies such as Coogan now claims existed, that the shapes are absolutely required, "when no signals are displayed upon the object which is' being towed."

I am at a loss to explain, therefore, how it was that this barge was displaying her bottom, so that a deckhand could, as he says, walk upon it when the dock was reached and

nail a spike, that some sort of a signal could not have been erected sooner, however makeshift such signal would be, so that the partly submerged barge would at least bear this warning, which in broad daylight and under the circumstances here proven would have undoubtedly prevented the collision. The failure to obey this rule was the proximate cause of this collision. The Pleiades (C. C. A.) 9 F.(2d) 804; The Southway (D. C.) 2 F.(2d) 1009. It was not, in my opinion, a condition. I believe this failure to obey the rule, either by showing the shapes or placing a signal upon the bottom of the barge, is sufficient to show the negligence of those in charge of the tugs of the Delaware, Lackawanna & Western Railroad Company.

However, if this is not correct, we come to the third and last question, which is in substance: Were those in charge of the tugs otherwise careful? I think that there can be no doubt that they were negligent. To allow a ferryboat to pass 100 feet away from tugs towing a partially submerged barge, where neither the tugs nor the barge carry any warning signal, those in charge of the tugs well knowing that the ferryboat is bound for her nearby slip, is coming with a strong ebb tide, and that a distance of almost 300 feet beyond the sterns of the tugs contains a danger, which may result not only in damage to property, but loss of life, and yet give no warning whatever of such possible danger, by whistles, shouts, or gestures, relying solely on the hope that the master of the ferryboat can see the obstruction, or on the belief that he will not make a turn within that space, is in itself sufficient evidence of negligence on the part of those in charge of such tow.

Neither the captain of the Westfield nor of the tugs is bound to anticipate negligence on the part of the other. The Pleiades (C. C. A.) 9 F.(2d) 804. But this does not mean that each is relieved from using due care on its own part. In my opinion, the masters of the Bernardsville and of the other two tugs should have called or attempted to call the attention of the Westfield, by any means reasonably possible, to the possible danger. This they entirely failed to do.

Accordingly I find that the libelant Hammond is entitled to a decree against the Delaware, Lackawanna & Western Railroad Company; that such libel should be dismissed as against the Central Railroad of New Jersey; that the Central Railroad of New Jersey is entitled to a decree against the Delaware, Lackawanna & Western Railroad Company.