### THE N. Y. CENTRAL NO. 31.

### THE NECHES.

District Court, S. D. New York.
July 26, 1935.

**1004**

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for the Neches.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for New York Cent. R. Co.

COXE, District Judge.

These suits grow out of a collision in the North River on November 13, 1929, between the steamship Neches, of the Clyde-Mallory Lines, and the tug No. 31 and the car float No. D-1, both belonging to the New York Central Railroad Company.

The collision occurred at about 5:42½ p. m. on November 13, 1929, about 1,000 feet off Piers 19 or 20, North River. The weather at the time was misty, the visibility fair—variously estimated at from one-half mile to a mile or two, and the tide was the last of the flood. The Neches was proceeding downstream, bound for Tampa, Fla., and the No. 31, with the No. D-1 in tow alongside on her port side, was proceeding out into the river from the slip between Piers 17 and 18, diagonally across the course of the Neches, bound for Sixty-Second street, North River. The stem of the Neches struck the starboard stern quar-

ter of the No. 31, then glanced off, and finally came into contact with the starboard after end of the No. D-1. All three vessels sustained considerable damage.

The Neches backed out from Pier 45, North River, at 5:30 p. m., and at 5:33 p. m. her engines were placed at "full ahead." The vessel was "all clear" of the pier at 5:35 p. m., and proceeded down the river, about 800 feet off the Manhattan pier ends, at a speed of 7 or 8 miles an hour through the water. The master was on the bridge directing the navigation, the third mate was at the wheel, and there was a lookout on the forecastle head.

On the way down the river, the Neches exchanged one blast passing signals with an Erie ferryboat bound in to Chambers street, and the Neches thereupon altered her course about one-half a point to starboard to pass under the ferryboat's stern. The ferryboat crossed ahead of the Neches, and, as the Neches cleared, the green side light and the towing lights of the No. 31 were seen two to three points on the Neches port bow. The distance between the vessels at that time was variously estimated at from one to five ship lengths (260 to 1,300 feet).

The Neches immediately sounded a one blast passing signal to the No. 31, which was answered by a danger signal; whereupon the Neches sounded a danger signal, put her engines full speed astern, helm hard aport, and sounded a three-blast whistle signal, indicating that her engines were going full speed astern. The engine room bell book shows that the Neches' engines were placed "full astern" at 5:42 p. m., and the collision occurred in less than half a minute thereafter.

The float No. D-1 is 365 feet long, and was lying on the north side of Pier 17, bow out, loaded with 16 railroad cars. The No. 31, on reaching the slip, attached a headline to the bow of the float, blew the slip whistle, and backed out into the stream. The deckhand on the tug's stern reported "all clear," and the tug swung round to a position on the up-river side of the float, and headed towards New Jersey. The headline was then shifted back to the side cleats on the float, the stern of the float extending "about 50 or 75 feet" beyond the stern of the tug, and the tug and tow proceeded towards midstream on a diagonal course, heading across and up the river.

When the stern of the float was about 200 feet off the Manhattan pier ends, the

No. 31 blew two whistles to the tug Eleanor Bush, which was proceeding downstream with two floats in tow, outside the Neches, and about off Piers 28 or 29. The Bush answered with two blasts, and then for the first time Captain Hofman of the No. 31 saw the Neches off Piers 27 or 28, about three-eighths of a mile away. No one from the tug had previously seen or reported the Neches, and there was no lookout on top of the cars.

The witnesses for the No. 31 testified that in this situation the tug blew a two-blast signal to the Neches; and Captain Hofman insisted that the Neches answered with two whistles. The witnesses for the Neches all denied, however, that they heard any two-blast signal from the No. 31, and were positive that there was no assent to such a signal. Moreover, none of the other witnesses for the railroad company supported Captain Hofman in his assertion that the Neches answered with a two-blast signal, and the subsequent movements of the Neches are utterly inexplicable on any theory that an assent was given. I have no difficulty in finding, therefore, that the Neches did not assent to any two-blast signal from the No. 31.

Captain Hofman testified, also, that the No. 31 continued on her diagonal course across the river for about seven minutes prior to the collision, and that during the last two minutes of this period the engines were running full speed ahead. He further testified that immediately before the collision he rang for an "extra jingle" in order "to get out of the way of the ship." The No. 31 had in the meantime blown danger signals, and the collision took place in the manner already stated.

On this showing, it is perfectly clear that the vessels were on crossing courses. The tow was fully made up outside of the slip, and for a period of about two minutes just prior to the collision the tug was proceeding at full speed on a definite course towards midstream. Moreover, the collision occurred about 1,000 feet off the Manhattan pier ends. There is no room, therefore, for any contention that the case is one of special circumstances. The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, 15 S. Ct. 99, 39 L. Ed. 139; The Hammond (D. C.) 37 F.(2d) 184; The Florence (D. C.) 68 F. 940, affirmed (C. C. A.) 89 F. 1015; The West Point (D. C.) 10 F. Supp. 975, 1935 A. M. C. 659.

■ The starboard hand rule plainly applies, and it was the duty of the No. 31 as the burdened vessel to keep out of the way. This was not done, but, on the contrary, the No. 31 proceeded at full speed directly across the course of the Neches; its fault is particularly glaring because of the failure to maintain a proper lookout. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The William A. Jamison (C. C. A.) 241 F. 950. It is no excuse, either, that the two-whistle signal to the Neches remained unanswered. The Florence (D. C.) 68 F. 940, 942.

■ It is insisted for the No. 31 that the Neches did not keep her course and speed as required by article 21 of the Rules. Unquestionably, her speed was maintained until just before the collision; but it is asserted that she changed her course to pass under the stern of the ferryboat. This change was, however, due to the necessity of navigating with respect to the ferryboat; and the rule is satisfied if the position of the Neches could reasonably have been foretold with accuracy. The Hoboken (C. C. A.) 59 F.(2d) 993; Commonwealth & Dominion Line, Ltd., v. U. S. (C. C. A.) 20 F.(2d) 729. Manifestly, this was possible, if those in charge of the No. 31 had been attentive and alert, which they were not.

■ It is also urged that the speed of the Neches was excessive; and although attempts have been made to demonstrate by minute calculations that the speed was as high as 10½ to 11 miles an hour through the water, I am convinced that the estimate of 7 or 8 miles an hour through the water, as given by the witnesses for the Neches, is substantially correct; and I cannot say that such a speed, under the existing circumstances, with the vessel on a course 800 feet off the pier ends, is excessive. Red Star Towing Co. v. Director General (C. C. A.) 292 F. 854; The Paris (D. C.) 37 F.(2d) 734, 738, affirmed (C. C. A.) 44 F. (2d) 1018.

■ The contention that the Neches did not stop quickly enough just prior to the collision is, I think, completely met by the showing that the Neches was the privileged vessel and required to keep her course and speed. The Neches reversed her engines immediately upon hearing the No. 31's danger signal, and, until that time, the Neches was entitled to assume that the No. 31 would give way, which it was her plain du-

ty to do under the circumstances. It can hardly be said, therefore, that the Neches was at fault for holding on too long. The Boston Socony (C. C. A.) 63 F.(2d) 246; The Binghamton (C. C. A.) 271 F. 69, certiorari denied 255 U. S. 575, 41 S. Ct. 377, 65 L. Ed. 793.

There may be a decree in favor of the libelant in the suit against the No. 31 for full damages with costs; and in favor of the claimant, dismissing the libel in the suit of the New York Central Railroad Company against the Neches, with costs.