Thomas C. CERRONE, Plaintiff,

v.

Michael F. CAHILL, Francis A. Defrancesco, Salvatore S. Valvo, Thomas M. Fresenius, Scott L. Brown, Richard G. Morse, Deborah L. Komar, Jonathan Z. Friedman and Gerald W. Connolly, Individually, Defendants.

No. 95–CV–241.

United States District Court, N.D. New York.

Jan. 28, 2000.

Hinman, Straub, Pigors & Manning, P.C., Albany, NY (Paul M. Collins, Lawrence H. Schaefer, of Counsel), for Plaintiff.

Chamberlain & Kaufman, Albany, NY (Alan S. Kaufman, Jeffrey Chamberlain, of Counsel), for Defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

## I. Background

### A. Facts

This action arises from Defendants' investigation of an alleged cover-up by Plaintiff, among others, of a hit and run accident that occurred on April 3, 1993 when an automobile operated by an individual later identified as Rory Knapp struck an automobile operated by Maureen Hunt. Rory Knapp fled the scene of the accident.

New York State Trooper Robert Gregory, of the Peeskill barracks, responded to the accident scene first. Plaintiff Thomas Cerrone ("Cerrone"), a New York State Police Sergeant and commander of the Peeskill Barracks in Troop K, also responded to the scene.[1] A witness, Ms.

Sharon Hunt–Ryder, informed Cerrone that she had witnessed the accident, observed a car leaving the scene, and followed that car. After obtaining a general description of the vehicle from the witness Cerrone left the scene and commenced an unsuccessful search for it.[2] According to Defendants, their subsequent investigation revealed that the car involved in the accident was parked in the area Cerrone claims to have searched. One witness stated that the car was "hidden" behind the Annsville Texaco Station. *See* Nov. 10, 1994 Statement of Dawn Brissett, p. 2, annexed to Brown Dec. at Ex. F.

Trooper Gregory prepared an accident report (the "Report") that was reviewed and signed by Cerrone.[3] Defendants allege that the Report contained details of a facially insufficient investigation and allegedly false information. Trooper Gregory testified that the information in the Report was true and complete. *See* Gregory Dep. p. 44, annexed to Collins Aff. as Ex. C.

On or about September 27, 1993, Defendants received a letter signed by "Ed Scott" alleging that Rory Knapp, the brother of State Trooper Timothy Knapp, left the scene of an accident on April 3, 1993. The letter further stated that the facts of the accident were covered up by Timothy Knapp and other members of the state police at the Peeskill station. Defendants followed up on the letter and identified one person named Ed Scott who denied writing the letter. Defendants never identified the source of the letter.

Despite their failure to positively identify the source of the letter, Defendants initiated an investigation into the allegations. Defendant Cahill was in charge of

1. State Troopers' regulations require that a sergeant respond to all serious injury and fatality accidents. Cerrone was notified that there was a head-on collision and responded prior to discovering that Hunt sustained only minor injuries. Cerrone Aff. at ¶¶ 18–19.

2. Defendants allege that Trooper Gregory did not follow correct police procedure at the accident because, among other things, he did

not broadcast a description of the car over the radio. Cerrone, on the other hand, claims that prior to his arrival on the scene he obtained this information from Trooper Gregory via the radio.

3. Plaintiff indicates that the report was put in the review box and any sergeant could have reviewed it.

the investigation and Defendants Brown, Komar, and Morse were assigned to the investigation. At some time after the investigation began, Jonathan Friedman and Gerald Connolly, members of the Westchester County District Attorney's Office, began working with the investigators with respect to possible criminal prosecutions.

The investigation revealed that Rory Knapp likely was the driver of the car in the April 3, 1993 hit and run accident; that he drove to a gas station after the accident; that he called the police department from the station and spoke to Zone Sergeant Welsh; and that there likely was some sort of cover-up of the accident involving at least Zone Sergeant Welsh and Timothy Knapp.

On January 17, 1995, the investigative team met to discuss a possible criminal case arising out of the alleged cover-up. Defendants decided to stop Cerrone on his way home from work, question him in connection with the April 3 accident, and determine if he would cooperate with the investigation.

Prior to stopping Cerrone, Lieutenant John Edward Grant, a Bureau of Criminal Investigation Agent, constructed a psychological profile of Cerrone to assist in the planned interview. *See* Grant Dep. at 21, annexed to Collins Aff. as Ex. L. Grant also arranged for rooms at a hotel, where the questioning was to be done, to "convey to [Cerrone] in a nonverbal manner that there had been an intense investigation with respect to [him]." *Id.* at 41–42.

Using an unmarked police car, Defendants stopped Cerrone on January 19, 1995. Defendants asked Cerrone if he was carrying a weapon, allegedly placed him in the felony position, placed him in the back of an unmarked police car (where he was guarded), transported him to a hotel room, read him his Miranda rights, informed him that he was the target of a criminal investigation, and questioned him for approxi-mately six hours. Cerrone was told he could leave after he agreed to take a polygraph examination, which he took the next day.

### B. Procedural History

Cerrone brought this action on February 23, 1995. On May 26, 1995, Defendants Cahill, DeFrancesco, Valvo, Fresenius, Brown, Morse, and Komar moved to stay the proceedings and dismiss portions of the Complaint. On August 17, 1995, the Court granted Defendants' motion to dismiss the claims for monetary damages against Defendants in their official capacities and denied the motion to stay the proceedings. *See* Order, Dkt. No. 21. Plaintiff filed an Amended Complaint on February 7, 1997 and on May 14, 1997, Defendants Friedman and Connolly moved to dismiss the Amended Complaint for failure to state a claim, or alternatively, on the grounds of absolute or qualified immunity. The Court heard oral argument on this motion June 10, 1997 and denied the motion in its entirety. *See* Order, Dkt. No. 62.

Presently before the Court is Defendants Brown and Fresenius's motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking to dismiss the Amended Complaint against them in its entirety. On January 10, 2000, the Court heard oral argument on this motion.[4]

### II. Discussion

### A. Standard for Summary Judgment

The standard for summary judgment is well-settled and need not be restated here. This Court has set forth the appropriate standard to be applied in numerous published decisions, *see, e.g., Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 232–33 (N.D.N.Y.1999); *Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551

---

**4.** Subsequent to the filing of this motion, the case was discontinued upon the merits against Defendants DeFrancesco, Komar, Friedman, and Connolly and the events of January 20th were eliminated from Cerrone's Amended Complaint.

(N.D.N.Y.1999), and will apply the same standard discussed in these cases to Defendants' motion for summary judgment.

Defendants contend that they are entitled to summary judgment because: (1) Cerrone cannot establish a Fourth Amendment violation because they were not required to have a warrant, probable cause, or any particular level of individualized suspicion to stop and question him in connection with a work-related investigation of misconduct; (2) Defendants are entitled to qualified immunity because the law requiring individualized suspicion was not clearly established; (3) Defendants had the requisite level of suspicion to seize Plaintiff in the context of the investigation; and (4) Defendants are entitled to qualified immunity because reasonable police officers could disagree whether there was a sufficient basis for individualized suspicion.

## B. Section 1983 Claim

■ To succeed on a 42 U.S.C. § 1983 claim, a plaintiff must prove that he was deprived of a constitutional right by a person acting under the color of state law. *See* 42 U.S.C. § 1983. Because Defendants clearly were acting under the color of state law, the Court must determine whether Cerrone was deprived of a constitutional right.

### 1. Fourth Amendment

Defendants first contend that they are entitled to summary judgment because Cerrone cannot establish that their conduct on January 19, 1995 violated his Fourth Amendment rights and, thus, there is no constitutional violation to support Cerrone's Section 1983 claim.

■ "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Davis v. Mis-*

*sissippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *see also Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For the purposes of this motion, Defendants concede that the January 1995 interview constituted a seizure within the meaning of the Fourth Amendment.[5] *See* Mem. of law in Supp. of Mot. for Summ. J. at 4, n. 1. Accordingly, it is necessary to determine whether the seizure, and alleged arrest, of Cerrone were reasonable. *See, e.g., New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

The Fourth Amendment's prohibition on unreasonable searches and seizures generally requires the police to secure a warrant based on probable cause prior to a search or seizure. The Supreme Court has consistently held that searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *See Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (internal citations omitted). Defendants contend that the facts of this case fall squarely within one of the recognized exceptions—that for work-related investigations—and that, as a result, they were not required to have a warrant, probable cause or any other level of individualized suspicion.

In making this argument, Defendants rely on cases involving work-related investigations of misconduct and place great emphasis on the Second Circuit's decision in *Biehunik v. Felicetta,* 441 F.2d 228 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). Cerrone contends that the facts of this case are distinguishable from *Biehunik* because the purpose behind Defendants' investigation and,

---

5. There is dispute as to whether this event constituted a seizure. Defendants allege that Cerrone consented to the interview, whereas Cerrone alleges that he did not consent and that no reasonable person in his position

would have believed that he was "free to leave" the hotel room where the interrogation took place. For the purposes of this motion the Court will assume that Cerrone was seized.

thus, Cerrone's alleged seizure and arrest, was criminal rather than work-related.

■ The manner of the alleged seizure and arrest support Cerrone's position that this investigation was criminal in nature. First, Cerrone was stopped on his way home from work, removed from his personal vehicle (the keys were subsequently taken), asked if he was carrying a weapon, allegedly placed in the felony position, placed in the backseat of an unmarked police vehicle (where he was guarded), transported to a hotel, advised that he was the target of a criminal investigation, given his Miranda rights, and interrogated for almost six hours. Defendants permitted Cerrone to leave after he agreed to take a polygraph test.

Second, the provisions of the applicable collective bargaining agreement set forth specific procedures for administrative investigations that Defendants did not follow during the interrogation of Cerrone. *See* Cerrone Aff. Ex. A. For example, if the search had been administrative, Cerrone would have had the contractual right to consult an attorney and/or a Union representative and the Defendants could not have requested that Cerrone take a polygraph examination. *See id.*

Third, the setting and preparation for the interview further support the conclusion that the interview was criminal. A Bureau of Criminal Investigations Agent constructed a psychological profile of Cerrone to assist in the interrogation, *see* Grant Dep. at 21, annexed to Connolly Aff. as Ex. L, and arranged rooms at a hotel in which to question Cerrone and "convey to [him] in a nonverbal manner that there had been an intense investigation with respect to [him]." *Id.* at 41–42, Ex. M.

Fourth, the record is replete with admissions that at the time of the stop Cerrone was the target of a criminal rather than administrative, investigation. *See, e.g.,*

Brown Testimony[6] at 32, annexed to Collins Aff. as Ex. N; Cahill Testimony[7] at 1108, annexed to Collins Aff. as Ex. O ("The 19th and 20th was a criminal interview not an administrative interview."). Finally, at oral argument, Defendants did not dispute that Cerrone was interrogated for the purpose of a criminal prosecution.

Defendants contend that the purpose behind the seizure—criminal or otherwise— is irrelevant and that the relevant distinction is whether the investigation targets work-related misconduct or conduct outside the workplace. According to Defendants, a criminal investigation targeting workplace misconduct requires no level of individualized suspicion whereas a criminal investigation targeting outside conduct requires a warrant and probable cause. For the following reasons, the Court does not find this argument persuasive and finds that *Biehunik* and other cases focusing on work-related investigations are distinguishable from the case at bar because the purpose behind Defendants' seizure was criminal, not administrative.

In *Biehunik,* the Second Circuit upheld a procedure in which 62 police officers were forced to appear in a lineup for purposes of identification following allegations of assault and battery by police officers. The officers selected to appear in the lineup were those who were stationed in the area at the time of the alleged assault. Although the Second Circuit found that the forced appearance was a seizure within the meaning of the Fourth Amendment, it held that the lineup was reasonable even though there was no probable cause, or any other level of individualized suspicion, to believe that any (or every) officer in the line up committed an assault. *Biehunik,* 441 F.2d at 230. Central to the Second Circuit's conclusion that the lineup was "reasonable" was the substantial public in-

6. This testimony is from Cerrone's disciplinary hearing before the Division of New York Police.

7. This testimony is from Cerrone's disciplinary hearing before the Division of New York Police.

terest in ensuring the appearance and actuality of police integrity. The Court stated:

> We do not believe that the public must tolerate failure by responsible officials to seek out, identify, and appropriately discipline policemen responsible for brutal or unlawful behavior in the line of duty merely because measures appropriate to those ends would be improper if they were directed solely toward the objective of the criminal prosecution.

*Id.* at 230. Although the police officers in *Biehunik* were warned that the investigation could have resulted in criminal charges and the officers were read their Miranda rights, none of the plaintiffs contended that the purpose of the investigation was to gather evidence for a criminal prosecution and the Second Circuit carefully distinguished the investigation therein from investigations in the criminal context. *See id.* ("In the familiar criminal arrest context, the reasonableness of a seizure of the person is indeed usually measured by the existence vel non of probable cause. But we cannot accept the contention that this principle, well established as it may be, must be applied inflexibly even in cases far removed from the criminal arena."), 230 ("such inspections normally do not infringe privacy as severely as the characteristic criminal search"), 231 ("We therefore need not consider at this time the propriety of enjoining a similar lineup conducted exclusively with criminal prosecution in mind."), and 231 (citing cases where fruits of warrantless search were admissible in internal disciplinary proceeding and excluded in criminal proceeding). Moreover, courts have found that the *Biehunik* Court held that "police officers might be subject to certain noncriminal searches and seizures that might otherwise violate the Fourth Amendment." *Shields v. Burge,* 874 F.2d 1201, 1206 (7th Cir. 1989). Accordingly, the Court finds that the holding in *Biehunik* is not controlling in this case where the targeted police misconduct is related to a criminal investigation.

Defendants also cite the Seventh Circuit opinion in *Shields,* 874 F.2d 1201, to support the contention that a warrant and probable cause are not necessary prerequisites to a seizure during the work-related investigation of misconduct even if such an investigation targets criminal prosecution. The lawsuit in *Shields* arose out of the search of a state police officer's desk, state-issued automobile, and a locked briefcase found within the automobile in the course of an investigation of alleged misconduct of the officer. The Division of Internal Investigation was investigating complaints that the officer had unlawfully transferred marijuana to a confidential source to determine if Shields "had violated any departmental rules and regulations." *Id.* at 1202. Although a special prosecutor had been appointed to investigate whether Shields had committed a crime, the above-discussed searches "were not connected with the criminal investigation." *Id.* The district court granted defendants' summary judgment motion finding that a " 'work-related' workplace search is lawful if the search is reasonable under the circumstances." *Shields,* 874 F.2d at 1203 (internal citations omitted). In *Shields,* the Seventh Circuit distinguished the workplace investigation at issue from a criminal investigation. The Court next determined that the officers involved in the search were entitled to qualified immunity because employees did not have a clearly established reasonable expectation of privacy in the workplace. The Court stated:

> ... it was not clear that searching the desk as part of an investigation into work-related misconduct (even without a reasonable suspicion that the desk contained evidence) would violate the Fourth Amendment. It is true that several courts, including this one, have held that an employer's searching or "bugging" an employee's office, without a warrant or probable cause, violated the Fourth Amendment.... [citing cases]. But those cases either involved criminal

investigations or were otherwise distinguishable from cases involving only work-related searches.

*Id.* at 1206. The *Shields* Court later reemphasized the distinction between the workplace investigation at issue and a criminal investigation stating "[u]nlike the automobile exception cases, this case did not involve a search for criminal evidence; it was part of a noncriminal investigation into work-related misconduct." *Id.* at 1207. Accordingly, *Shields* is distinguishable from the case at bar. The case of *Sponito v. The City of New York,* 1986 WL 6158 (S.D.N.Y.), *aff'd,* 805 F.2d 391 (2d Cir. 1986) (internal investigation of police corruption), and other cases Defendants relied on are similarly distinguishable.

Because the Court finds that the holdings in *Biehunik, Shields,* and *Sponito* were limited to the level of suspicion required for work-related investigations, rather than criminal investigations, the decisions are not controlling in this case, which involves a criminal investigation. *See Lowe v. City of Macon,* 720 F.Supp. 994 (M.D.Ga.1989), *aff'd,* 925 F.2d 1475 (11th Cir.1991) (Table) (distinguishing *Biehunik* and *Shields* on these grounds).

The distinction between searches and seizures for the purpose of criminal prosecution and those undertaken for work-related or administrative purposes is critical and many courts upholding a standard lower than probable cause have recognized that the lower standard is not appropriate in the criminal arena. *See, e.g., Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 666, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding mandatory drug test policy and noting that "[t]est results may not be used in a criminal prosecution of the employee without the employees consent."); *O'Connor v. Ortega,* 480 U.S. 709, 722, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) ("In contrast to other circumstances in which we have required warrants, supervisors in offices such as at the Hospital are hardly in the business of investigating the violation of criminal laws."); *Gossmeyer v. McDonald,* 128 F.3d 481, 492 (7th Cir.1997) ("The presence of so many officials might seem excessive, but their presence did not transform an agency work-related search into a criminal search requiring probable cause and a warrant."); *United States v. Taketa,* 923 F.2d 665, 675 (9th Cir.1991) ("However, where the search is conducted by the government employer to further a criminal investigation, the traditional requirements of probable cause and warrant are applicable.... Traditional Fourth Amendment safeguards applicable in the context of criminal investigations cannot be avoided simply because the agency conducting the search is not a governmental law enforcement agency but a governmental employer ostensibly supervising its employees.") (internal citations omitted); *Security Law Enforcement Employees ("SLEE") v. Carey,* 737 F.2d 187, 204–05 (2d Cir.1984) ("There is no dispute that, at the time of the searches, none of the corrections officers were serving a sentence of imprisonment for conviction of a crime, none were being detained following arraignment upon a criminal charge, and none were under arrest for a criminal charge."); *Philadelphia Fed'n of Teachers v. School District of Philadelphia,* 1998 WL 196403, at *6 (E.D.Pa. Apr. 23, 1998); *Lukas v. TriBourough Bridge and Tunnel Auth.,* 1993 WL 597132, at *7 (E.D.N.Y. Aug.18, 1993); *City of Macon,* 720 F.Supp. 994; *Burka v. New York City Transit Auth.,* 739 F.Supp. 814, 828 (S.D.N.Y.1990) ("The probable cause standard is 'peculiarly related to criminal investigation' .... The evidence shows that enforcement of the criminal code is not a goal of the TA's drug testing program."). In *Taketa* the Ninth Circuit emphasized that the reasonable suspicion standard is inappropriate for workplace searches for criminal evidence. The court stated:

> ... when MacVean switched roles from public employer to criminal investigator, the investigation changed and the standard of reasonableness imposed on the

search changed with it. No longer could the DEA rely on *O'Connor*. The rationale for the lesser burden *O'Connor* places on public employers is not applicable for federal agents engaged in criminal investigation.... The DEA cannot cloak itself in its public employer robes in order to avoid the probable cause requirement when it is acquiring evidence of a criminal prosecution. While the burden of showing probable cause and obtaining a warrant may be "intolerable" for public employers, it is de riguer for law enforcement officials.

923 F.2d at 675 (internal citations omitted). Accordingly, in the criminal context, the appropriate standard for searches and seizures involving work-related misconduct is probable cause.

Although Cerrone argued at oral argument that Defendants' actions on January 19, 1995 amounted to an arrest and the Amended Complaint contains a cause of action pursuant to 42 U.S.C. § 1983 for unlawful arrest, neither party addresses the alleged arrest, or the appropriate standard, in their motion papers. It is beyond peradventure that probable cause is necessary for a lawful arrest. *See, e.g., Florida v. White*, 526 U.S. 559, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999).

Accordingly, if Cerrone was seized or arrested without probable cause, his Fourth Amendment rights were violated.

## 2. Probable Cause

Defendants next contend that they are entitled to summary judgment because they had probable cause to believe that Cerrone was involved in the alleged cover-up and, thus, the alleged seizure and arrest did not violate the Fourth Amendment.

In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court held that law enforcement authorities have probable cause where "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that a "criminal offense had occurred." *Id.* at 162, 45 S.Ct. 280. The Supreme Court expanded this concept in *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), which held that probable cause depends upon "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175, 69 S.Ct. 1302. Subsequently, the Supreme Court has emphasized that probable cause is a "practical," "fluid," and "flexible" standard whose application depends on an evaluation of the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Thus, the determination of probable cause turns on an analysis of the facts of the case at bar.

Defendants initiated their investigation of the alleged cover-up on the basis of uncorroborated allegations in a letter signed by "Ed Scott." During the initial stages of the investigation, Defendants attempted to find Ed Scott, however, the only Ed Scott located denied writing the letter. Defendants had no basis on which to assess their informant's credibility because they were unable to ascertain his or her identity.

Defendants' investigation revealed that Cerrone was on duty the night of the accident; he was present at the scene (although Trooper Gregory was the investigating officer); he allegedly looked for the car that fled the scene of the accident; the car allegedly was parked (although it may have been hidden) where Cerrone looked; he signed the accident report which may have contained false information and details of a facially deficient investigation; and he was the station commander in charge of the barracks where the alleged cover-up took place. The investigation, however, revealed little evidence linking Cerrone, as opposed to other officers, to the cover-up. *See* Brown Aff., Ex. A.

Moreover, as of January 17, Defendants needed more information/evidence to prosecute any of the State Troopers. Notes of Defendant Brown state "we need oral admissions from member(s) to further proceed against any targets besides Rory Knapp." *See* Collins Aff., Ex. J.

 On a motion for summary judgment, courts are required to construe all facts and inferences in favor of the non-moving party. *See Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995). A determination of what constitutes probable cause is a mixed question of fact and law. *See, e.g., Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The determination of whether the facts underlying probable cause existed is a matter of fact and the determination of whether the facts found to be true constitute probable cause is a question of law. *Id.* Accordingly, where there are disputed factual issues underlying a determination of probable cause, summary judgment is not appropriate. *See, e.g., Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994). Here, there are disputed facts that are material to the determination of probable cause. For example, at this juncture, it is not clear if the car was parked in an area where Cerrone would have seen it if he had searched the area behind the gasoline station and Defendants have not established that their informant(s) (including the unidentified author of the letter) reliability. Looking at the facts in the light most favorable to Cerrone, it is not clear that Defendants had probable cause to seize and or arrest Cerrone on January 19. Accordingly, Defendants' motion for summary judgment on this ground is denied.

## C. Qualified Immunity

Lastly, Defendants argue that this Court should grant summary judgment because they are entitled to qualified immunity. Defendants first allege that qualified immunity is appropriate because they did not violate a "clearly established" right of Cerrone, insofar as the law requiring probable cause, or any other level of individualized suspicion, for seizing a police officer in a criminal investigation of work-related misconduct was not clearly established. Defendants also argue that they are entitled to qualified immunity because reasonable officers could have disagreed whether probable cause did in fact exist on January 19.

### 1. Standard for Qualified Immunity

 The doctrine of qualified immunity shields government officials from suit for acts undertaken in the course of their duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The right at issue must be identified at an appropriate level of generality: "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal quotations and citations omitted). When a right is clearly established, qualified immunity also attaches "insofar as it was objectively reasonable to believe that [the government agent's] acts did not violate these rights." *Calamia v. City of New York,* 879 F.2d 1025, 1035 (2d Cir.1989).

#### a. Did Plaintiff have a clearly established right not to be seized or arrested without probable cause or individualized suspicion in the context of a criminal investigation?

Defendants contend that because of the broad language in the Second Circuit's

opinion in *Biehunik,* Cerrone did not have a clearly established right not to be seized without probable cause or any level of particularized suspicion. As discussed *infra* at II(B)(1), the *Biehunik* Court upheld the "seizure" of 62 police officers in the context of an work-related investigation in the absence of any individualized suspicion. The Second Circuit expressly declined to "precisely delineate the outer bounds of reasonableness in investigations of suspected police misconduct." *Biehunik,* 441 F.2d at 231. In light of this language, Defendants argue that no individualized suspicion was required for their seizure of Cerrone and, at the very least, the level of suspicion required for lawful seizures in investigations of police misconduct was not "charted clearly" and no "clearly defined right" was violated by the Defendants' actions.

Cerrone responds that *Biehunik* is distinguishable because it involves a work-related rather than criminal investigation. As previously explained, the Court agrees with this distinction. While *Biehunik* does not support a finding that probable cause is required for the seizure of a police officer in a criminal investigation arising out of work-related misconduct, it does support a finding that some level of individualized suspicion is required in such an investigation. Although the *Biehunik* Court recognized that criminal prosecutions could arise from the line-up, in several places the Second Circuit noted that investigations targeting criminal prosecutions were distinguishable from the work-related investigation of police misconduct at issue there. *See* 441 F.2d at 230, 231. Moreover, the Court stated that it was not considering "the propriety of enjoining a similar lineup conducted exclusively with criminal prosecution in mind." *Id.* at 231. Although this language does not specify what level of suspicion is necessary in a criminal investigation of police misconduct, it does suggest that some level of individualized suspicion is required in a criminal rather than administrative investigation. In carving out an exception for work-relat-

ed investigations of police misconduct, the *Biehunik* Court did not disturb the well-settled principle outside the ambit of that exception that absent exigent circumstances, probable cause is required for seizures and arrests in the criminal context.

■ In 1987, the Supreme Court decided *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714, and further elucidated the distinction between workplace searches in internal and criminal investigations. The *O'Connor* lawsuit arose from the search of a hospital employee's office as part of a work-related investigation of misconduct. The Supreme Court held that workplace searches should be judged by a reasonableness standard and set forth a test that focused on whether the search was reasonable at its inception and reasonably related in scope to the circumstances which justified the interference. *See O'Connor,* 480 U.S. 709, 725–26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). Before reaching this conclusion, the Court emphasized the distinction between internal workplace searches and criminal investigations, recognizing that "while law enforcement officials are expected to 'school themselves in the niceties of probable cause,' no such expectation is generally applicable to public employers, at least where the search is not used to gather evidence of a criminal offense." *Id.* at 724, 107 S.Ct. 1492 (internal citation omitted). The *O'Connor* Court distinguished the case before it from those "in which we have required warrants" because "supervisors in offices such as at the hospital are hardly in the business of investigating violations of criminal laws." *Id.* at 723, 107 S.Ct. 1492. The Court further noted that "employers most frequently need to enter the offices of their employees for legitimate work-related reasons wholly unrelated to illegal conduct." *Id.* at 722, 107 S.Ct. 1492. Moreover, the Court noted that because the concept of probable cause is "rooted ... in the criminal investigatory context"

it is difficult to give the concept "much meaning when the purpose of the search is to retrieve a file for work-related reasons." *Id.* at 723, 107 S.Ct. 1492.

The Supreme Court's decision in *O'Connor* clarifies any ambiguity created by *Biehunik* regarding the necessary level of suspicion for a work-related criminal search or seizure. Combined with the well-settled principles that (1) police officers do not lose their constitutional rights merely by joining the police force, *see, e.g., Garrity v. State of New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and (2) probable cause is a necessary prerequisite to a lawful criminal search or seizure, *see, e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the *O'Connor* decision indicates that it was clearly established that probable cause was necessary to seize Cerrone in the context of a criminal, rather than work-related, investigation. It is clearly established that where a search or seizure is conducted by a government employer to further a criminal investigation, the traditional requirement of probable cause is necessary. *See O'Connor,* 480 U.S. at 724, 107 S.Ct. 1492, *Taketa,* 923 F.2d at 675, *Lukas,* 1993 WL 597132, at *7. Moreover, government employers cannot avoid the traditional Fourth Amendment safeguards applicable in the context of criminal investigations simply by labeling a criminal search work-related. *See Taketa,* 923 F.2d at 673; *Lukas,* 1993 WL 597132.

### 2. Did Defendants act reasonably?

Finally, Defendants claim that they are entitled to qualified immunity because their actions were objectively reasonable. Defendants are entitled to qualified immunity "if either (a) it was objectively reasonable for [them] to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997). "Whether a reasonable officer could have believed he had probable cause is a ques-

tion for the trier of fact, and summary judgment or a directed verdict in a § 1983 action based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." *Hunter v. Bryant,* 502 U.S. 224, 233, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In this case, for the reasons previously stated, the question of whether Defendants' actions were objectively reasonable in the absence of probable cause requires resolution of genuine issues of material fact and, thus, a reasonable finder of fact could reach more than one conclusion. Accordingly, summary judgment is inappropriate.

### III. Conclusion

For the foregoing reasons, Defendants' motion for Summary Judgment is DENIED in its entirety.

**IT IS SO ORDERED**